IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DZHOKHAR  TSARNAEV

No.  13-CR-10200-GAO

## REPLY  TO  GOVERNMENT'S  OPPOSITION
## TO  MOTION  TO  COMPEL  DISCOVERY

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this Reply to the government's Opposition ("Opp.") [DE # 129] to his Motion to Compel Discovery ("Mtn. Compel") [DE # 112].

The government has advanced an erroneously narrow view of is discovery obligations under Rule 16, *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v Whitley*, 514 U.S. 419 (1995), and their progeny, particularly in a case where capital crimes are charged.  The government nevertheless characterizes its production to date as "generous" (Opp. at 4), and emphasizes the disclosure of "hundreds of witness statements from . . . teachers, neighbors, classmates, and friends" of Mr. Tsarnaev. (Opp. at 3.)

To the extent the defense can discern any animating principle in the government's production decisions, it would appear that the government's self-described "generous" (but still spotty and inconsistent)[1] approach to discovery applies only to witnesses at the periphery of Mr. Tsarnaev's life and the allegations against him, while the government continues to withhold reports and testimony of the greatest utility and interest concerning those closest to Mr.

---

[1] The defense believes that documents concerning numerous law enforcement interviews of witnesses in the categories identified by the government for "voluntary" disclosure — "teachers, neighbors, classmates, and friends" — still have not been produced.

Tsarnaev, including his parents, siblings, sister-in-law, and other family members.  The Supreme Court has warned against "tacking too close to the wind," particularly in a death penalty prosecution.  *Kyles*, 514 U.S. at 439.  Other than seeking tactical trial advantage, it is difficult to understand why the government would resist or delay broader, comprehensive disclosures in a case such as this one, where a stringent protective order is in place, and fairness as well as the appearance of fairness are paramount.

The government's reliance on language from *United States v. McVeigh*, 954 F. Supp. 141 I(D. Colo. 1997) (Opp. at 6), is ironic.  *McVeigh* was perhaps the most prominent federal death penalty prosecution in recent U.S. history, arising from the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, which resulted in 168 deaths, more than 600 injuries, and destruction or damage of more than 324 buildings in a 16-block radius.  As the *McVeigh* opinion cited by the government noted, federal prosecutors in that case adopted an "open file" disclosure policy, in stark contrast to the government's close-to-the-vest approach to discovery here.  *See id.* at 1443.   But in the *McVeigh* court's view, even that level of transparency — described by the judge as "[G]o fish and find what you want; and if there's anything there that's exculpatory, you're welcome to it," *id*. — was <u>insufficient</u> to fulfill the government's affirmative obligation to identify and produce exculpatory evidence.  The court in *McVeigh* went on to explain:

> Application of the *Brady* doctrine to this case is especially difficult because the scope of inquiry is so broad and the information gathering capability of all government agencies is so great. The lawyers appearing on behalf of the United States, speaking for the entire government, must inform themselves about everything that is known in all of the archives and all of the data banks of all of the agencies collecting information which could assist in the construction of alternative scenarios to that which they intend to prove at trial. That is their burden under *Brady*. They must then disclose that which may be exculpatory under the materiality standard of *Kyles*. The government has objected to some of Mr. McVeigh's requests as "burdensome." That is not a proper objection. The

failure to comply with a constitutional command to present evidence fairly at trial is not excused by any inconvenience, expense, annoyance or delay. Determining materiality of information discoverable under Rule 16 or required to be produced under *Brady* must not be made according to a cost benefit analysis.
. . . .
There is no doubt that intelligence agencies of the United States have considerable stores of information with a wide range of credibility and of varying value in pursuing investigations of particular crimes . . . . Requests under Rule 16 must be sufficiently clear to inform the prosecution about what is sought. Such specificity is not required for a suggestion that the prosecutors consider the defendant's information in pursuing their duty to be informed under *Brady*. Due process requires the government lawyers to resolve their doubts in favor of disclosure.

*McVeigh*, 954 F. Supp. at 1450 (emphasis added).

Despite the greater openness of prosecutors in *McVeigh*, subsequent events in that case further illustrate the peril of even inadvertent failures to disclose information to the defense in a death penalty case. McVeigh's execution was delayed when it belatedly came to light that the FBI had failed to turn over more than 3,000 pages of interview reports. *See* David Johnston, *Citing F.B.I. Lapse, Ashcroft Delays McVeigh Execution*, THE NEW YORK TIMES (May 12, 2001); *see also* George Fisher, *What Prosecutors Can't Hold Back*, THE NEW YORK TIMES (May 19, 2001) ("Prosecutors in the McVeigh case admirably agreed to turn over all evidence, regardless of whether it would help the defense. Yet even in this high-profile case, prosecutors could not guarantee complete compliance by law enforcement investigators. All signs suggest the Federal Bureau of Investigation worked in good faith to turn over everything but was overwhelmed by the extraordinary volume of material.").

Against that backdrop, this Reply will treat in turn each of the government's discursive arguments about the nature and scope of its discovery obligations and then will address each of the pending defense requests.

## I.     THE DEFENSE REQUESTS ARE TIMELY.

The government asserts that the many of the defense requests are "premature" because the government has not yet decided whether it will seek the death penalty, and goes on to cite cases for the general proposition that *Brady* only requires disclosure "in time for the defendant to make effective use" of the information.  (Opp. at 2.)  The government's argument ignores the multiple citations in the defense motion to capital cases across the country in which courts have ordered the earliest practicable disclosure of information relevant to sentencing precisely so that the defense can marshal and use the information in the death penalty pre-authorization process. *See* Mtn. Compel at 5-6 (citing cases).  Failure to provide such information in sufficient time to be useful in the authorization process has formed at least part of one court's decision to strike a death penalty notice.  *See, e.g., United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 89 (D. P.R. 2003).  Moreover, given the extraordinary size and global scope of required investigation in this case, the earliest possible disclosure is also necessary in order for the defense to make use of the information prior to trial, *e.g.*, in travels to interview witnesses and to obtain documents in foreign countries.  *See McVeigh*, 954 F. Supp. at 1449 ("The information should be given to the defense <u>as it becomes known to the government</u>, since the information and material must be available to the defense in sufficient time to make fair use of it.") (emphasis added).

## II.   THE GOVERNMENT'S VIEW OF "MATERIALITY" IS TOO NARROW.

The government emphasizes that *Brady* and Rule 16 only require production of evidence that is "material."  (Opp. at 4-5, 10-11, 13.)   However, the government's reliance throughout its opposition primarily on appellate cases employing retrospective analysis of whether information could have affected the outcome of a completed trial is misplaced in the pre-trial context.  The standard governing "materiality" prior to trial is necessarily different:

> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of "materiality" discussed in . . . appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase. The only question before (and even during) trial is whether the evidence at issue may be "favorable to the accused"; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.
> . . . .
> Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure.

*United States v. Safavian*, 233 F.R.D. 12, 16 (D. D.C. 2005).[2]  Even "evidence itself inadmissible

---

[2] The government's quotation of cases for the proposition that disclosure is not required based on mere "possibility" of  finding exculpatory information (Opp. at 9-10), none of which were death penalty cases, does not help its cause. The Supreme Court's decision in *United States v. Agurs*, 427 U.S. 97 (1976), is actually helpful to the defense.  While the Court held that a new trial was not warranted based on withheld evidence in the particular case, the Court also explained: "[T]here is a significant practical difference between the pretrial decision of the prosecutor and the post-trial decision of the judge.  Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure."  *Id.* at 108.  *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994), concerned speculation about the content of agents' notes that were destroyed.  *United States v. Davis*, 752 F. 2d 963 (5th Cir. 1985), was an appeal based on a general *Brady* request, where the defendant failed to establish the existence of any exculpatory evidence.  *United States v. Arroyo-Angulo*,

could be so promising a lead to strong exculpatory evidence that there could be no justification

for withholding it." *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003).

### III.    ALL LIFE HISTORY INFORMATION IS MATERIAL FOR SENTENCING MITIGATION.

The government argues that not all information concerning Mr. Tsarnaev's character and

life history is "favorable material information" with respect to sentencing because some

information is "flatly inconsistent with his proposed mitigation theories and therefore may be

used against him at a future sentencing."  (Opp. at 6.)  With this argument, the government

misapprehends the nature of a mitigation investigation and presentation.  At this stage, the

defense does not have fixed mitigation "theories"; various hypotheses under investigation in the

alternative are not necessarily consistent with each other.  Because evidence that may be offered

in mitigation has "virtually no limits," *Tennard v. Dretke*, 542 U.S. 273, 285 (2004), the defense

needs to gather and place in context <u>all</u> available sources of information to depict Mr. Tsarnaev

in all his complexity, to assist the Attorney General and possibly later a jury to see Mr. Tsarnaev

as a complete human being who should not be sentenced to death. The government's selective

and narrow approach to disclosure of life history information — attempting to categorize facts as

either "favorable" or "unfavorable" without acknowledging that these lines are unclear,

especially when the information is viewed as part of a fabric, rather than individual threads — is

---

580 F.2d 1137 (2d Cir. 1978), concerned in-camera proceedings, not government *Brady*
disclosures.  In *United States v. McDonnell*, 696 F. Supp. 356 (N.D. Ill. 1988), the defendant
sought a wide range of materials for impeachment without any showing that they would be
exculpatory, but the government agreed to produce an FBI 302 containing exculpatory
information as well as basic impeachment materials. *United States v. Weld*, 2009 WL 901871
(N.D. Cal. 2009), involved a request for discovery about a non-testifying informant.  *United
States v. Mwangi*, 2010 U.S. Dist. LEXIS 14443 (N.D. Ga. 2010), involved a defense request for
a "letter to satisfy his curiosity and complete his records."

both quixotic and perilous.[3]

## IV.   DISCLOSURE OF SUMMARY INFORMATION AND WITNESS IDENTITY IS NOT SUFFICIENT.

The government's arguments that production of summary information fulfills its obligations and that *Brady* only requires disclosure of witness identities (not the content of their statements) are incorrect.  (Opp. at 7-12.)

First, taken at face value, the government's arguments would excuse nearly all *Brady* violations, including some of the most notorious government failures to make *Brady* disclosures. In this District, for example, the government's suppression of exculpatory information in *Ferrara v. United States* would have been excused because the defense could have learned (indeed, ultimately did learn) independently that a known witness told the government that *Ferrara* had not ordered a murder.  *See Ferrara*, 384 F. Supp. 2d 384, 387 (D. Mass. 2005).   If that were the law, *Brady* would be left toothless and eviscerated.[4]

---

[3] Cases cited by the government for the proposition that only the government may determine what is exculpatory (Opp. at 11-12) do not support removing the Court from the process where the defense argues that the government is making determinations based on legally invalid premises.  The government's quotation of *United States v. Prochilo*, 629 F.3d 264 (1st Cir. 2011), omitted the following language:  "When the defendant seeks access to specific materials that the government maintains are not discoverable under *Brady* . . . a trial court may in some instances conduct an in camera review of the disputed materials."  *Id*. at 268.  The government's quotation of *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), omitted the following:  Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final."  *Id*. at 59 (emphasis on omitted phrase).  The government's quotation of *United States v. Danovaro*, 877 F.2d 583 (7th Cir. 1989), omitted the following:  "[C]ounsel must be satisfied with the representations of the prosecutor, fortified by judicial inspection in close cases."  *Id*. at 589 (emphasis on omitted phrase).  *United States v. Causey*, 356 F. Supp. 23 681 (S.D. Tex. 2005), involved a situation where, despite being provided "open file" access, the defense sought an order directing the government to conduct and report on a separate extensive review.  Mr. Tsarnaev in this motion has made the "particularized showing of materiality and usefulness" that was absent in *United States v. Volpe*, 42 F. Supp. 2d 204, 226-27 (E.D.N.Y. 1999).

[4] The cases cited by the government (Opp. at 7-9) fail to support its position that mere disclosure of witness identity is all that *Brady* requires.  *United States v. Brown*, 582 F.2d 197 (2d Cir.

Second, even assuming that awareness of a witness or independent availability of information to the defense might defeat a *post hoc* constitutional *Brady* challenge to a criminal conviction under a kind of "no harm, no foul" analysis, such principles do not extinguish the government's disclosure obligations *ab initio*.   In this District, the Local Rules expressly require the production of exculpatory information without qualification:   that is, without suggestion that an obligation to produce the information itself, in its native form, can be satisfied by producing a bare summary or merely by identifying prospective witnesses who may be able to provide the information.   Cases holding that *Brady* trumps *Jencks* do not state that the government could properly withhold witness statements if it produces summaries instead.   *See, e.g., United States v. Snell*, 899 F. Supp. 17, 21 (D. Mass. 1995); *United States v. Poindexter*, 727 F. Supp. 1470, 1485 (D. D.C. 1989) ("The *Brady* obligations are not modified merely because they happen to arise in

---

1978), involved belated disclosure of inconsistent statements by a government witness.   While the conviction was sustained because the defendant ultimately was able to use the nugget of information at issue during trial, it surely would have been better practice for the government to produce the statements in timely fashion.   In *United States v. Dupuy*, 760 F. 2d 1492 (9th Cir. 1985), the court remanded the case for *in camera* inspection of the prosecutor's notes of witness statements to determine whether their disclosure might have affected the trial.   With regard to *United States v. Reddy*, 190 F. Supp. 2d 558 (S.D.N.Y. 2002), the government quoted language that the government "may direct the Defendant's attention to any witnesses who may have material exculpatory evidence" but omitted this:  "[T]he Government is not required to produce section 3500 [*Jencks*] materials other than as required by the statute, <u>unless such statements are material within the meaning of *Brady*.   In such case, the Government must produce material witness statements in time to permit their effective use at trial</u>."   *Id*. at 575-76 (emphasis added). In *United States v. Sampson*, 820 F. Supp. 2d 202 (D. Mass. 2011), Judge Wolf found no *Brady* violation where underlying law enforcement reports had, in fact, been produced.   The issue was whether further "embellished" accounts of the same information given to prosecutors in grand jury preparation sessions were improperly withheld.   *See id*. at 232.   In *United States v. LeRoy*, 687 F. 2d 610 (2d Cir. 1982), the court found no *Brady* violation that would warrant relief because the underlying facts were known to the defendant and the grand jury testimony at issue was not material.   The government's quotation from *United States v. Bland*, 432 F. 2d 96 (432 F. 2d 96, 97 (5th Cir. 1970), is ripped from context.   In its entirety, the relevant passage reads: "With the exception of certain files viewed in camera, <u>the Government turned over its entire file used in the prosecution</u> and then stated that no further evidence concerning Bland was contained in its records.   The court below did not abuse its discretion in refusing to allow additional inspection which could only be described as a 'fishing expedition' or a refinement of facts already possessed by appellant."   *Id*. at 97 (emphasis added).

the context of witness statements.").

Third, courts have recognized that defense knowledge of the existence of a witness does not mean that the witness or information possessed by the witness is "available" to the defense, a touchstone of *Brady* analysis.  The Seventh Circuit explained in *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001):

> We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes. To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement. Or, as may have been the case here, the defense witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution.

*Id.* at 740.

Finally, the government argues derisively that the defense request for underlying reports in order to permit evaluation of witness' truth and reliability would require production of "what amounts to *Giglio* information for <u>possible defense witnesses</u>" (Opp. at 9) (emphasis in original), as if such a requirement were patently absurd.  In fact, however, the Government's *Giglio* obligations with respect to prospective defense witnesses are unresolved in this Circuit.  S*ee United States v. Salemme*, 1997 WL 810057, *7 (D. Mass. 1997) ("It appears to be an open question whether the government must produce information concerning statements of a defense witness which has impeachment value.") (citing *United States v. Ster*n, 13 F.3d 489, 495 (1st Cir. 1994)).  Other First Circuit authority supports a requirement that the government produce such information.  *See United States v. McMahon*, 938 F.2d 1501, 1504 (1st Cir. 1991) ("[I]f the defendant does call the witness at trial, and the witness' trial testimony could be refreshed or impeached by the grand jury testimony, then defendant should have access to the earlier

statements.") (internal quotation marks and citation omitted).

### V.    FED. R. CRIM. P. 16(a)(1)(E) SUPPORTS THE DEFENSE REQUESTS.

The government argues that Rule 16(a)(1)(E), which requires production upon request of information, whether inculpatory or exculpatory, that is "material to the defense" does not apply to sentencing mitigation information.  (Opp. at 13.)  In support, the government relies upon *United States v. Armstrong*, 517 U.S. 456 (1996), which held that rule could not be used to compel discovery pertinent to a "selective prosecution" defense, and *United States v. Brinson*, 208 F. App'x 420 (6th Cir. 2006), an unpublished 6th Circuit decision which extended *Armstrong* to requests for information to be used at a sentencing hearing.  The Sixth Circuit's application of *Armstrong* (which was about discovery in aid of a speculative affirmative defense) to sentencing (a critical stage of any proceeding, especially in a capital prosecution) is unwarranted, particularly in light of the recognition in this district of the purposes underlying Rule 16 generally:

> Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

*United States v. Pesaturo*, 519 F. Supp. 2d 177, 189 (D. Mass. 2007) (internal quotation marks omitted)

Moreover, implicit in the government's argument is an erroneous assumption that information pertinent to its case-in-chief is entirely segregable from information pertinent to sentencing.  Surely the government intends to put into its case-in-chief evidence about the alleged roles of each Tsarnaev brother in the offenses, their alleged motives for the crimes, and facts about their backgrounds that bear on these issues.  That this information would <u>also</u> become

central to any eventual sentencing arguments does not somehow render it immune from discovery under Rule 16.

> *Defense Request # 1:  All information and documents concerning or comprising communications (including, without limitation, e-mail messages) between or among law enforcement personnel, prosecutors, and the Court concerning our client's repeated requests for a lawyer during questioning at Beth Israel hospital following his arrest.*

The government repeats its assertion that the request is moot because it has complied. (Opp. at 14.)  This is incorrect.  The government has produced information regarding the interrogation of Mr. Tsarnaev, but has not responded in writing to the request for any communications or documents regarding his repeated requests for a lawyer, even to indicate whether such documents exist.  Given the national publicity about the government's announced intention to interrogate Mr. Tsarnaev without reading him his rights, it strains credulity to think that the agents who questioned him did not convey to anyone else in the government — or consult with them  regarding — his affirmative requests for a lawyer.  If any representatives of the government urged the Court either directly or indirectly to delay appointment of counsel prior to the initial appearance without informing the Court that Mr. Tsarnaev had affirmatively requested counsel, any such communications also should be disclosed.

> *Defense Request # 2.  The complete immigration "A-files" of certain individuals.*

A-files should be produced because they contain biographic information material to both defense of the case-in-chief (to the extent motive and family history comes into play) and mitigation at sentencing.  Concerns about privacy are addressed by the stringent protective order. The suggestion that Immigration authorities under auspices of Homeland Security are not part of the "prosecution team" cannot withstand scrutiny in light of the multi-agency investigative

Case 1:13-cr-10200-GAO   Document 144   Filed 11/07/13   Page 12 of 15

efforts here.[5]   Even with signed release forms from certain family members, Immigration authorities have refused to release A-files on the grounds that they relate to an "ongoing law enforcement investigation."

> *Defense Request # 3.   FBI 302s, police reports, Grand Jury transcripts, and any other documents comprising or concerning interviews of or statements by certain named individuals.*

> *Defense Request # 4.   Transcripts of Grand Jury testimony by individuals as to whom FBI 302s and other reports already have been produced.*

With regard to these two requests, the government contends that its "voluntary" production of statements from some witnesses and summary information from others is sufficient. For the reasons described in the legal argument section above, the government is incorrect.

> *Defense Request # 5.   All documents and reports concerning surveillance of and/or interviews of Tsarnaev family members by law enforcement before April 15, 2013.*

The government states that any such information is "nonexculpatory, duplicative of other information already disclosed, and/or unlikely to lead to the discovery of admissible evidence." (Opp. at 19.)   These are not proper reasons to withhold the materials.   Past law enforcement surveillance of or interactions with the Tsarnaevs would be material to the defense to the extent, for example, that they shed light on Tamerlan's alleged motive,  the duration, extent, and timing of Tamerlan's alleged radicalization, and other matters that may bear on the relative roles of Tamerlan and his younger brother.   These issues would be relevant and material both in the government's case-in-chief and for sentencing mitigation.

---

[5] Cases cited by the government in this section of its Opposition (Opp. at 15-16) do not support its position.  *United States v. Ruiz*, 536 U.S. 622 (2002), concerned the absence of obligation to share impeachment information prior to execution of a plea agreement where a defendant waives accompanying constitutional guarantees related to trial.  The quotation attributed to *United States v. Freeman*, 164 F. 3d 243 (5th Cir. 1999), is not contained in that case.

*Defense Request # 6.  Audio recordings of telephone calls from FMC Devens and reports/transcripts concerning/comprising those calls if/as they are created.*

Whether or not Mr. Tsarnaev's recorded calls are "innocuous" *vis a vis* the allegations of the case, they are still relevant.  The absence of problematic statements would tend to support the defense Motion to Vacate Special Administrative Measures.  The recordings will also shed light on family dynamics in aid of the sentencing mitigation investigation.  The government routinely produces recorded jail calls in criminal cases and it is difficult to comprehend why it resists doing so here.  Production of reports summarizing the calls is not an adequate substitute because the time lag is long and the defense should be able independently to verify the accuracy of government summaries and translations.[6]

*Defense Request # 7. All documents and information concerning or comprising intercepted communications (e.g., U.S. mail, voice (telephone/skype/etc.) calls, text messages, e-mail messages, web search history/browser requests) of the defendant and his family members.*

*Defense Request # 8. All documents concerning or comprising "tips," warnings, or other information provided by Russian authorities concerning Tsarnaev family members.*

The government contends that these requests are "premature" and goes on to say that, when the requests are ripe, it will "follow all legal requirements respecting production" of any responsive materials. For the reasons explained above, the government is wrong about timing. This information would be material to the defense against the government's case-in-chief.  As argued above, sentencing mitigation evidence also should be produced immediately so that the defense can make effective use of it in the death penalty authorization process and preparing for trial.

---

[6] Both of the cases cited by the government (Opp. at 19-20), *United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990), and *United States v. Skillman*, 442 F.2d 542 (8th Cir. 1971), involved rejection on appeal of a defendant's assertion that a failure to produce investigative recordings warranted reversal. Neither case addressed the pre-trial discoverability, upon request, of a defendant's recorded jail calls.

*Defense Request # 9.  All documents concerning the investigation of the triple homicide that occurred in Waltham, MA on September 10-11, 2011, including without limitation documents concerning investigation of the alleged involvement of Tamerlan Tsarnaev, Ibragim Todashev, and/or our client in those murders.*

The government argues that disclosure related to Tamerlan Tsarnaev's alleged involvement in the triple homicide is premature and goes on to invoke the common law privilege protecting an ongoing investigation.  (Opp. at 21-22.)  The government is wrong about timing for the reasons explained above.  As to the purported law enforcement privilege, according to the very case that the government cites, it must submit responsive documents to the Court for *in camera* inspection in order to determine whether the government's interest in protecting details of the investigation outweighs the defendant's interest in disclosure.  *See In re Department of Homeland Security*, 459 F.3d 565, 570 (5th Cir. 2006) ("On remand, the district court should review the documents at issue in camera to evaluate whether the law enforcement privilege applies to the documents at issue. In making its determinations, the court must balance the government's interest in confidentiality against the litigant's need for the documents.") (internal quotation marks omitted).

## Conclusion

For the foregoing reasons, this Court should order the Government to produce the requested discovery.

Respectfully submitted,

DZHOKHAR  TSARNAEV
by his attorneys


/s/ William W. Fick

Judy Clarke, Esq.
California Bar:  76071
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 7, 2013.

/s/ William W. Fick