UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

## MOTION FOR CONTINUANCE

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully moves to continue the trial in this case to a date on or after September 1, 2015.

### Introduction

The trial in this case is currently scheduled to begin just 16 months after the defendant was indicted.  This 16-month period is *one-half* the median preparation time that federal courts have allowed defendants on trial for their lives over the past decade, and would bring this case to trial faster than 103 of the 119 federal capital trials to get underway since 2004.

We recognize that the government and many members of the public, especially in the Boston area, may want the trial to begin quickly.  But it is critically important that any trial be fair, which means giving both sides, not just the government, enough time to uncover and present all relevant evidence.   Despite defense counsel's best efforts, the accelerated trial schedule has outpaced the requirements of so complex a case.  A substantial continuance therefore is necessary in order to secure the defendant's rights to due process of law, the effective assistance of counsel, and an individualized and non-

1

arbitrary capital sentencing determination under the Fifth, Sixth and Eighth

Amendments.

In summary, the reasons justifying a reasonable continuance are as follows:

1.   The normal challenges to investigating potential mitigating factors in a high-profile capital case have been enormously increased  — and the investigation has been hobbled and slowed  — by barriers of distance, language, and culture, among many others.

2.   The sheer scope of the law enforcement investigation of the Marathon bombing, and the massive amount of testimonial, physical, digital and expert evidence that it has generated, have overwhelmed the ability of defense counsel to evaluate and respond to the government's case in the time allotted.   This already enormous challenge has been exacerbated by the government's slow, inconsistent and disorganized production of discovery material, and by its long-delayed and abstruse expert disclosures, which have diverted defense time and resources, caused needless litigation, and impeded defense preparation for trial.

3.   Domestic defense mitigation investigation has been conducted amid a growing atmosphere of anxiety and agitation generated by highly-publicized arrests, indictments, prosecutions, deportations (and, in one instance, the FBI killing) of members of Dzhokhar and Tamerlan Tsarnaev's peer groups.  The investigation has been further hampered by aggressive FBI follow-up tracking and questioning of potential witnesses, as well as by the unrelenting attention of the news media. As a result, the most basic defense investigative work of contacting and interviewing witnesses who possess important information has been unusually time-consuming and laborious.

In combination, these three extraordinary problems have created a situation in

which the defense cannot be prepared adequately to test the government's case, nor to

present the defendant's own evidence in mitigation of sentence, by the current trial date

of November 3.  Given the "vital importance to the defendant and to the community that

any decision to impose the death sentence be, and appear to be, based on reason rather

than caprice or emotion," *Gardner v. Florida*, 430 U.S. 349, 357 (1977), it would be constitutionally intolerable to adhere to any trial schedule that would allow time for only the government's side to be fully heard.

**A.     The current trial schedule is unusually fast compared to the normal practice in the federal courts.**

There can be no uniform answer to the question of how much time is needed to prepare the defense of a capital case for trial, since each case differs in many ways from every other.  But before turning to the reasons why the defense in *this* case cannot be expected to be ready for trial by November 3, it is instructive to establish a framework based on the actual experience of the federal courts throughout the nation.

The main reason that we cannot be ready for a trial beginning on November 3 is the government's decision to seek the death penalty.  The threat of the death penalty exponentially increases the issues and evidence that the defense must investigate and prepare for.  This is true of capital cases generally, not just this one.  It is the reason why capital cases almost always take longer to prepare and try.

To be sure, most federal capital cases are resolved by negotiated guilty pleas leading to sentences of life imprisonment without possibility of release, rather than by adversarial trials by jury.  However, since January 1, 2004, we are aware of 150 federal capital defendants who have proceeded to trial with the government seeking imposition of the death penalty.  *See* Exhibit A, Declaration Of Kevin McNally Regarding Pre-Trial Preparation Time (August 29, 2014).   In these 150 federal cases that have actually reached trial, district courts have allowed the defendants an *average* of approximately 36

3

months' preparation time between indictment and the start of trial. *Id.* The *median* time-to-trial has been 32 months. *Id.* In this case, by contrast, the period between the defendant's indictment on June 27, 2013, and the current trial date of November 3, 2014 is just over 16 months — one-half of the median pretrial period, and a mere 44 percent of the time allowed in the average defendant's case.[1]

In a previous declaration filed four months before the government announced its intention to seek the death penalty in this case, the defendant advised the Court that data collected for the vast majority of the 493 defendants against whom the Attorney General had authorized the death penalty showed the average interval between indictment and the trial date to be 28 months. *See* Declaration of Kevin McNally Regarding Pre-Trial Preparation Time, DE 107-2 (filed Sept. 27, 2013). Though much longer than the 16-month pretrial period currently in effect here, this 28-month figure significantly understated the amount of pretrial preparation time generally allowed in the federal courts, because roughly half of these defendants' cases ended without trial, mainly through plea bargains for life-without-release sentences. *See* Exhibit E, Federal Death Penalty Resource Counsel Project, *The Federal Death Penalty* (Aug. 28, 2014). Thus, it cannot be known whether those cases would actually have begun trial on the dates reflected on the dockets. By contrast, the 36-month average and the 32-month median

---

[1]An alphabetical listing of all 150 defendants known to have begun capital trials since January 1, 2004 is provided as Exhibit B. We also have provided a spreadsheet arranging these 150 defendants by the number of months that elapsed between their indictments and the start date of their trials. *See* Exhibit C. Exhibit D arranges this same data by trial rather than by defendant, and reflects that a total of 119 separate capital trials have commenced during the period since January 1, 2004.

reflected in Exhibit A encompass only those cases with unquestionably "real" trial dates — because all of those trials actually got underway on the dates listed.  We have also focused on the last decade so as to best reflect current practice.[2]

We do not suggest that the trial schedule in this case should be dictated by the schedules adopted in all of the federal capital trials over the past decade, or by any other single consideration.  But in deciding whether a given trial schedule allows the defense too little time to prepare, the contemporary practices of all of the federal courts throughout the nation provide a valuable baseline for comparison.  Such a comparison shows that this case is on a very fast track to trial.   Indeed, if the case actually starts trial on November 3, it will rank as the sixteenth-fastest federal capital case to reach trial out of 119 such trials since 2004, *see* Exhibit D, and the pretrial preparation time permitted the defendant will be less than that afforded 127 of the 150 individual defendants who have stood trial in those cases.  *See* Exhibit C.  In considering the particular reasons why the defense in this case needs more time to prepare, we submit that the Court can and should give due regard to the overall record and practices of the federal courts on this important question.

**B.  The legal standard.**

The law governing appellate review of rulings on motions for continuance is well-established.  A half-century ago, the Supreme Court set forth these broad governing

_____

[2] The 2004 start point is also appropriate because it encompasses the entire period since the Supreme Court underscored defense counsel's constitutional obligation to conduct an in-depth social history investigation in capital cases in *Wiggins v. Smith*, 539 U.S. 510 (2003).

principles:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. A myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 378 U.S. 575, 598-99 (1964) (internal citations omitted); *accord*, *United States v. Delgado-Marrero,* 744 F.3d 167 (1st Cir. 2014).  To be sure, because "each case is *sui generis*," *United States v. Saccoccia,*  58 F.3d 754, 770 (1st Cir. 1995), appellate rulings on claims that trial courts abused their discretion in denying continuances provide only limited guidance to a trial judge seeking to exercise discretion fairly.   That said, the First Circuit has listed these general factors governing appellate review of denials of continuance:

> A reviewing court must look first at the reasons contemporaneously presented in support of the request for the continuance. See *United States v. Lussier*, 929 F.2d 25, 28 (1st Cir.1991). Other relevant factors may include such things as the amount of time needed for effective preparation, the amount of time actually available for preparation, the amount of time previously available for preparation and how assiduously the movant used that time, the extent to which the movant has contributed to his perceived predicament, the complexity of the case, the availability of assistance from other sources, the probable utility of a continuance, the extent of inconvenience to others (such as the court, the witnesses, and the opposing party) should a continuance ensue, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance.

*Saccoccia,* 58 F.3d at 770.

A few of these factors may be dealt with at the outset.  Because this motion is made sufficiently in advance of trial, before jurors or witnesses have been summoned (and indeed before the Court has determined the venue for trial), granting a continuance now is unlikely to cause any substantial inconvenience to the Court, the witnesses, or the government.   As the Court is already aware, and as will be discussed in additional detail below, "the complexity of the case" is obviously great.  And while "the amount of time needed for effective preparation" can never be calculated with precision, the fact that much more preparation time is normally afforded in far less complex federal death penalty cases across the United States weighs in favor of a finding that more time is required for the defense to be effectively prepared.  It is also important that this is the defendant's first request to continue the trial date, and that the case has not previously been continued.  *Contrast United States v. Maldonaldo*, 708 F.3d 38 (1st Cir. 2013) (upholding denial of ninth continuance in order to allow third substitution of retained defense counsel).  Ultimately, however, the question raised by this motion must be decided by considering "the reasons . . . presented in support of the continuance." *Saccoccia*, 58 F.3d at 770.  The following reasons touch on each of the remaining *Saccoccia* factors and militate in favor of a continuance.

**C.  The reasons why a continuance is warranted**

1.  **Overseas mitigation investigation.**  The first of these challenges — the impossibility of investigating the life history of a youthful suspect in just 16 months when so much of the evidence must be sought across barriers of language, culture and suspicion in conflict-torn regions of Chechnya, Dagestan,  and Central Asia — is

7

described in detail in an sealed *ex parte* submission that accompanies this motion.   The

reasons why this filing must be made under seal is explained in a separate pleading.

Suffice it to say here that public disclosure of the circumstances surrounding the defense

investigation in this case would greatly exacerbate the already-formidable obstacles that

counsel face.

**2.  <u>The volume of potentially relevant evidence.</u>**   The second extraordinary

feature of this case is its sheer size.  The Boston Marathon bombing has been investigated

by more than 1,000 FBI and other agents from additional federal, state, and local law

enforcement agencies, by an inter-agency task force representing the entire United States

Intelligence Community, and by at least five separate committees of the United States

Congress. The government has gradually produced some 6.7 terabytes of discovery,

including more than 100,000 pages (over 10,500 documents) of witness statements,

reports, photographs, and scientific tests produced in scanned formats; thousands of items

of physical evidence;  and — perhaps most daunting of all — thousands of gigabytes of

digital evidence derived from a large and steadily-growing array of personal computers,

cellular telephones, portable hard drives and other digital storage devices, internet web

sites, and social media sites such as Facebook, Twitter, and the Russian-language

Odnoklassniki.   Most recently, the government's continuing expert disclosures were

accompanied by more than 90 gigabytes of additional data, including more than 110,000

non-Bates-stamped files contained in 10,000 unindexed folders.[3]

---

[3] Even these dizzying statistics understate the magnitude of the discovery and other
disclosures received so far.  Much of the 6.7 terabytes of discovery was provided in

In a non-capital case, where the only question to be resolved is the defendant's factual guilt or innocence of the crimes charged in the indictment, defense counsel might safely ignore much of this tsunami of evidence and information, and limit their attention to the relatively narrow (albeit still massive) categories of evidence bearing directly on whether the defendant helped perpetrate the offenses alleged.   But in a capital case, the issues bearing on the issue of sentence are much broader.   In this case, for example, they include the apportionment of responsibility between the defendant and his plainly dominant older brother.   Pursuing this single question — and there are many others like it — requires that the defense identify and classify thousands of items of circumstantial evidence contained  in each of the brothers' various computers and digital storage devices so as to show precisely when, and in which direction, violent ideological material cited in the indictment flowed between them.   The government has already indicated that it plans to call two FBI specialists in computer forensics and the management of digital information to provide the prosecution's answers to these questions, but has yet to provide any hint of precisely what evidence they intend to use from the digital devices or what they intend to say about them.   In a declaration filed along with this motion, the defense has explained how laborious and time-consuming is the task of independently analyzing this vast body of digital evidence, what remains to be done, and why the work

compressed files; we do not know (and have not used scarce time to find out) the volume in terabytes those files proved to be, collectively, once "unzipped."   Likewise, to pick out just one of many such examples, a single scanned "page" of the more than 100,000 pages referred to above, Bates No. DT-0015743, bearing the title "Discovery Photography Drive," is actually a scanned picture of a hard drive which itself contains 24,558 separate photo and video files in 794 folders.

could not have been completed in the relatively short time allotted so far.  See Exhibit F, Declaration of William Fick.

Nor may the defense ignore the vast quantity of discovery bearing on the impact of the Marathon bombings on the victims and the wider Boston community.  Given the government's repeated claims that the bombing was one of the most effective and devastating terrorist crimes in recent U.S. history, and its recent disclosure that it will seek to prove at sentencing the likely traumatic impact of the bombing and its aftermath on countless thousands of Boston children and youth,  defense counsel would fail to fulfill their constitutionally-mandated role unless they fully evaluated both these claims and the vast array of evidence on which they are based.  *See generally Gardner v. Florida,* 430 U.S. 349, 362 (1977) (due process violated by death sentence "that was imposed, at least in part, on the basis of information which [the defendant] had no opportunity to deny or explain"); *Rompilla v. Beard*, 545 U.S. 374 (2005) (defense counsel's failure to review court file that they knew would be used in aggravation of sentence denied capital client's Sixth Amendment right to effective assistance of counsel).  There is, in short, very little in this truly massive array of documentary, digital, physical and expert evidence that the defense can safely disregard without examination.

For the foregoing reasons, this case would have proven too massive for the defense to be prepared for a November 3 trial and the capital sentencing proceeding that may follow even had government adopted a more cooperative approach to discovery.  But as exemplified by recent litigation regarding the government's inadequate and untimely expert disclosures, the already-formidable obstacles have been compounded by

10

the government's needless delays, disorganized data dumps, and its recurrent practice of requiring the defense to litigate (at considerable cost in time and effort) our entitlement to evidence (such as Tsarnaev family A-files, FBI interviews, and expert disclosures), only to turn around months later and provide the information anyway, sometimes without comment or explanation, in the midst of some new massive round of disclosures. Countless FBI lab reports that were completed a year ago or more are only now being disclosed, with the result that our deadlines for responding to and challenging the vast array of scientific and technical evidence in this case have been needlessly compressed into the last two months before the current trial date of November 3.[4]  Leaving aside whether the government has complied with its minimum discovery obligations, it might have been expected to do better than this after pressing successfully for such an early trial date.  In any event, the government's actual performance in managing the discovery and expert disclosures in this case provides yet another reason why this massive case simply cannot be fairly brought to trial in less than half the time of the average federal capital prosecution.

   3.  <u>**The impact of a growing atmosphere of fear on the mitigation investigation.**</u>

   In addition to the unusual obstacles created by distance, language, culture, and the huge scale of the law enforcement investigation in this case, the defense mitigation investigation within the United States has been hampered by continuing arrests,

---

[4] A description of some of the challenges—and time requirements—involved in reviewing and evaluating the government's scientific and technical evidence as it has been provided in this case is contained in the declaration of Frederick Whitehurst, attached hereto as Exhibit G.

prosecutions, and other law enforcement activity focused on those close to the Tsarnaevs and the community in which they lived.  By its very nature, this is an impediment that can never be quantified with certainty, because witnesses who are too intimidated to talk to us about our client or about his brother Tamerlan, for example, also are likely to be too intimidated to tell us why.  But it is undeniable that the period between the defendant's arrest on April 19, 2013 and the present has been marked by a succession of highly-publicized arrests, deportations, federal criminal prosecutions, and even one killing of former friends and acquaintances of both Dzhokhar and Tamerlan Tsarnaev.  Most of those targeted have been foreign nationals who inevitably fear deportation regardless of whether criminal charges are ever brought or proven against them.  The sequence of events includes the following:

- **May 1, 2013.** Azamat Tazhayakov and Dias Kadyrbayev, two Kazakh nationals and college friends of Dzhokhar Tsarnaev are arrested and later convicted of obstruction of justice and conspiracy in connection with their handling of certain of the defendant's belongings. Tazhayakov was convicted by a jury on July 21, 2014, and Kadyrbayev pled guilty on August 21, 2014.  The prosecutions of both men continue to be highly publicized throughout the Boston area.

- **May 1, 2013.** Robel Phillipos, Dzhokhar's high school and college friend, is arrested and charged along with Tazhayakov and Kadyrbayev with making false statements to the FBI.  Phillipos's trial is set to begin on September 29, 2014.

- **May 22, 2013.**  Ibragim Todashev, a friend of Tamerlan Tsarnaev and Tamerlan's suspected accomplice in a 2011 murder of three men in Waltham, Massachusetts, is shot to death by an FBI agent during questioning at Todashev's Florida apartment.

- **May 30, 2014.**  Another friend of Tamerlan, Khairullozhon Matanov, is arrested and charged with obstruction of justice and making false statements to the FBI. He is currently being held without bond.

- **May 30, 2014.**  Konstantin Morozov, a friend of Tamerlan, is arrested and jailed pending deportation, despite a pending appeal on his asylum application.  The arrest reportedly followed Morozov's refusal of an FBI request to wear a wire while speaking to yet another of Tamerlan's Chechen friends.

- **July 22, 2014.**  Stephen Silva, a high school and college friend of Dzhokhar, is arrested on federal drug and gun possession charges.  Law enforcement sources immediately leak the allegation that Silva provided the gun named in the indictment to Dzhokhar Tsarnaev, and that the same gun was later used to kill MIT police officer Sean Collier. Silva is currently being held without bond.

In addition to these public arrests and prosecutions, the defense is aware of other acquaintances of the Tsarnaevs who have been detained and placed in deportation proceedings.  Others with lawful immigration status have been detained for hours and required to surrender their electronic devices upon re-entry to the United States.

To be clear, we do not to question the government's motives in pursuing criminal or immigration violations.   Rather, we list these subsequent cases and law enforcement activities simply to make the intuitively obvious point that as such arrests, prosecutions, deportations, and detentions increase, members of the Tsarnaevs' peer groups inevitably come to feel that any sort of cooperation with the defense investigation will risk attracting attention from law enforcement and immigration authorities.  Many of the witnesses who are most necessary to the mitigation investigation are also most vulnerable to fear of law enforcement reprisal.  These include Dzhokhar Tsarnaev's high-school and college friends and classmates, his fellow athletes, and members of the Chechen, Russian and Muslim communities in Boston.  These difficult circumstances are compounded by a continuing pattern of aggressive FBI re-interviewing of potential witnesses — on

occasion within hours of an attempted contact by a defense investigator.  And all of this is occurring under the glare of unrelenting news media coverage.

To be sure, patient, time-intensive work with a few of these potential witnesses has gradually secured some degree of cooperation.  But in such a generalized atmosphere of fear, where any sort of cooperation with the defense (as opposed to the FBI or the prosecution) reasonably appears to carry great personal risk, it is taking the defense much longer than normal to carry out the most basic investigative task of interviewing the defendant's friends, peers and acquaintances.  And this in turn constitutes another reason why this case has proven to be a poor candidate for a much faster-than-usual trial schedule.

**D.  Other factors weighing in favor of continuance.**

There are several other factors which support, even if they do not independently compel, a continuance that would put this case on a pace closer to that of the great majority of federal death penalty trials.  These include:

- Continuing leaks and outright advocacy in the news media on the part of current or recently-retired members of law enforcement have exacerbated already high levels of prejudice among the potential jury pool, and further diverted defense time and attention into efforts — ineffective so far — to prevent recurrence.

- As the government has argued in opposing the defendant's request for a change of venue, there is authority for the proposition that the prejudicial impact of pretrial publicity tends to lessen over time.   DE 512 at 14-16.  To the extent that the government is correct, the prejudicial impact of the undeniably massive publicity

surrounding the Boston Marathon bombing (and the more recent follow-on arrests and prosecutions of several of the Tsarnaev brothers' friends) will tend to decrease if this case were placed on a more typical pace to trial.

- If the defendant is convicted of the capital counts against him, the current trial schedule is likely to result in the jury's beginning sentencing deliberations around the time of the second anniversary of the bombing (April 15, 2015), an event which can be expected to produce an intense surge of highly emotional publicity that could threaten the fairness of the proceedings.

We cannot overemphasize that this motion does not ask that Mr. Tsarnaev be treated differently than other federal capital defendants. Rather, we are asking that he *not* to be treated differently, and that he not be given far less time to prepare for trial than is typically allowed in much less complex federal capital cases.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), the defendant requests that this motion be set for oral argument. Counsel believe that argument may assist in the Court in resolving the important issue raised by the motion.

Dated:   August 29, 2014

Respectfully submitted,
DZHOKHAR TSARNAEV
by his attorneys

*/s/    Judy Clarke*

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484

JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 29, 2014.

*/s/ Judy Clarke*