UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 13-10200-GAO |
| | ) | |
| DZHOKHAR TSARNAEV | ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO
SECOND MOTION TO CONTINUE TRIAL DATE**

Defendant, Dzhokhar Tsarnaev, by and through counsel, respectfully submits this reply to the government's Opposition [DE 824] to his Second Motion to Continue Trial Date [DE 804]. The government's arguments are largely comprised of generalizations that cannot withstand scrutiny and other statements that are simply wrong.

For example, the government contends that the defense "could hardly have been surprised" by the size of the witness list because of its "refusal to enter any stipulations." Opp. at 2. The government's claim that the defense has refused to make any stipulations is false. We have advised the government repeatedly that we are willing to consider stipulations to streamline the trial presentations and to avoid unnecessary testimony (*e.g.,* from records custodians, from those who would do nothing more than confirm links in the chain of custody of numerous items, etc.) about which there likely is no controversy. To date, however, the government has not provided even a single proposed stipulation to the defense.

The government also has continued to resist defense requests for production of reports and other contemporaneous documentation concerning crime scene evidence

1

collection as well as the seizure, handling, and forensic processing of electronic devices — materials that would permit the defense to meet its legal responsibility to verify many of the types of stipulations the government could be expected, eventually, to propose.

Meanwhile, the press has spread the government's false claim about stipulations, which is being used to malign the defense request for continuance as some kind of illegitimate "tactic" and further prejudice the public and prospective members of the jury pool against the defense. *See, e.g.*, Bob McGovern, *Tsarnaev Team Tactics Become Overbearing*, THE BOSTON HERALD (Dec. 26, 2014)[1] ("The biggest federal case in Boston since the Whitey Bulger trial is certainly complicated — thanks in no small part to Tsarnaev's defense team's foot-dragging. They won't stipulate to any evidence, according to prosecutors. So a conga line of witnesses will have to march into court as the government attempts to prove even the smallest piece of evidence is what they say it is.").

Contrary to the assertions in the *Herald* article, which flow directly from the content and tenor of the government's opposition, this is not a situation where the defense "keeps asking for more" as a "stall tactic" while "complaining about a number of uncomfortable situations it has put itself in." *Id*. It was the government that elected to pursue the death penalty in this case. If the government remains unwilling to relent in seeking death and the case therefore must be tried, the defense is asking for nothing more

---

[1] This article is *available at* <https://www.bostonherald.com/news_opinion/local_coverage/2014/12/mcgovern_tsarnaev_team_tactics_become_overbearing>.

than a trial that is fair.   The minimal standards for constitutionally competent death penalty representation are demanding:

> The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

American Bar Association, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* (2008).

Only adequate preparation makes a fair trial possible.  But we face a situation where Mr. Tsaranev is being afforded substantially *less* time to prepare than the vast majority of defendants in federal capital cases; less time, even, than Gary Sampson's defense will have to prepare for a sentencing-only re-trial in this district of a case already tried once over a decade ago.

While the government may be loath to admit it, *both* sides would obviously benefit from a continuance, which also would serve the broader interests of justice.   Affording the parties additional time to prepare their respective presentations in an organized and orderly fashion would facilitate efforts to reach agreement about issues that need not be

litigated, narrow and focus contested issues that the Court must decide, and streamline a complex and lengthy trial.

**Volume and State of Discovery**.

Putting aside for a moment the government's unsupported generalizations about the scope of its affirmative disclosure obligations versus its "voluntary" accommodation of defense requests over the entire history of the case, the fact remains that on December 17 and 18, the government produced 19,448 Bates-numbered pages (and some other collected items such as spreadsheets and audio files that also were assigned individual Bates numbers)[2] of what it characterized as witness-related materials, that is, borne of the government's obligation to produce so-called "*Jencks*" (witnesses' prior statements) and "*Giglio*" (witness impeachment) materials. The volume of this disclosure, alone, requires a continuance.

Contrary to the government's argument, Opp. at 4, the nature and volume of the December 17-18 productions also brings the government's disclosures here squarely within the scope of the *Massachusetts Lawyers Weekly* Editorial Board's criticism of

---

[2] Assuming the government is correct that the 3.0 gigabyte Bates-numbered production on December 18 wholly duplicated part of the 166.87 gigabyte December 15 un-numbered production, that still leaves 163.87 gigabytes of additional material from the December 15 production that the defense must digest. Even crediting the government's assertion that the omission of indices for the December 17 and 18 productions was "inadvertent," Opp. at 3, it still has not provided an index of the December 15 production, which would facilitate identification of any duplicate materials re-produced on December 18. The December 15-18 disclosures also fit a pattern of earlier productions. For some, indices were never provided, most notably the 90-gigabyte, 100,000-plus file "dump" of expert-related materials in July 2014. For others, indices were only provided days later after repeated defense requests (*e.g.,* the index to a government production on September 26 was not forthcoming until October 6). Indices provided contemporaneously with government productions have been the rare exception rather than the rule.

government tactics in the *O'Brien* case, except that here the volume of materials withheld until 21days before trial is more than double the volume at issue in *O'Brien,* and here the government is seeking the death penalty. *See* Editorial, *U.S. Attorney Should Stop 'Gotcha' Litigation Tactics*, MASSACHUSETTS LAWYERS WEEKLY, Jan. 16, 2014.

The core question that the *Lawyers Weekly* Editors asked is one that has vexed the defense from the outset of this case: why would the government hew to a rigid, narrow, and minimalist view of its affirmative disclosure obligations "when a defendant's liberty" — and here, his life — as well as "the public's perception of the system's fairness, [are] on the line?" *Id.; contrast, e.g., United States v. McVeigh*, 954 F. Supp. 141 (D. Colo. 1997) (describing government's "open file" approach to discovery in that case while requiring the government to be even more proactive in its disclosures).

The government has made abundantly clear that it holds a very narrow conception of what is relevant: the defendant's specific alleged role in the charged offenses and indicia of his own alleged "radicalization" viewed solely through the lens of his own computer. But the government has charged conspiracy offenses, which necessarily implicate the alleged role of Tamerlan Tsarnaev as well. The brothers' alleged "radicalization" is a more complex story over a longer period of time that can only be understood by painstaking analysis of activity across multiple electronic devices that the government has seized.[3] Moreover, a constitutionally-adequate penalty-phase defense

---

[3] Among the items in the government's December 15 production were the contents of Ibragim Todashev's hard drive. This is important to the defense not because of any putative connection to the Waltham murders but because Todashev and Tamerlan Tsarnaev exchanged electronic messages containing links to and attachments of what the

will require a broader and more holistic presentation concerning the defendant and his background.

The government's parsimonious approach to its automatic discovery obligations has indeed made discovery more protracted by requiring the defense to make repeated follow-up requests over time as it reviews the steady incoming flow of materials and conducts its own investigation. But the government's self-serving assertion that much of the voluminous evidence it reluctantly and belatedly produced is defense-requested (apparently to imply lack of relevance) does not make it so, nor does it relieve the defense of its constitutional obligation to review all of the material thoroughly, which takes time.

### Stephen Silva

The defense explained in its Second Motion to Continue that witness-related information contained in the massive December 17-18 government disclosures requires investigative follow-up. As but one example, the defense cited Stephen Silva, who has entered an agreement to cooperate with the government by testifying against Mr. Tsarnaev in exchange for consideration at sentencing for separate federal crimes that he has admitted committing. In its Opposition, the government responded: "The full extent of Silva's likely testimony was disclosed to the defense in great detail virtually as soon as Silva was arrested. The only newly-disclosed Silva materials are more recent statements

---

government would surely characterize as "radical" materials. The contents of Todashev's computer, which will take time to analyze, likely will help to fill important gaps in the story about "radicalization" of the Tsarnaev brothers and the origins computer files to which the government and its experts attribute great significance.

he made that largely elaborate on his earlier statements." Opp. at 3-4.  The government's characterization is incorrect.

The government previously produced recordings of conversations between Silva, an informant, and an undercover law enforcement agent. The defense has made efforts to investigate some of the factual matters contained therein with limited "leads" to do so. The December 17 production included, in addition to traditional impeachment materials (*e.g.*, Silva's proffer letter):  multiple previously undisclosed FBI 302s documenting interviews of Silva that reveal new aspects of his likely testimony; previously undisclosed FBI 302s documenting interviews with multiple other witnesses concerning Silva and the subject matter of his likely testimony; and hours of recorded jail calls by Silva.

The previously undisclosed 302s provide names of at least six witnesses who can assist the defense to probe the veracity of an alleged connection between a gun in Silva's possession and the one ultimately recovered at the Watertown shootout.  These witnesses also have impeachment information about other cooperating witnesses, including their drug use, psychiatric and cognitive impairments, and biases and motives to lie.

In short, these materials provide important leads for investigation concerning the substance of Silva's prospective testimony as well as bases for impeachment.  Perhaps most importantly, the new materials identify a putative eyewitness to relevant interactions between Silva and the defendant who is presently believed to be located outside the United States.  Simply put, the December 17 disclosures put the defense in a position to conduct in-depth investigation that was not possible before, including investigation of the

background, reputation, and criminal conduct of witnesses who will figure prominently in the government's case.

### **Witness List**.

As noted above, the government's claim that the defense has refused to enter stipulations is false. The government's related claim that it "offered to remove [law enforcement witnesses] from the list if Tsarnaev agreed to stipulations or some other accommodation that would obviate the need for those witnesses," Opp. at 2, is also misleading. The government has never actually quantified or identified witnesses among the nearly 600 law enforcement personnel listed who were mere "evidence handlers" or whom it might otherwise "remove" in the wake of yet-to-be-proposed stipulations. This leaves the defense in precisely the predicament we identified in our motion, with no way to separate the "wheat" from the "chaff" as we try to focus our trial preparation efforts.

### **Exhibit List**

Ordinarily, when the government produces a witness list to the defense it simultaneously provides pre-marked copies of the exhibits themselves (and/or a straightforward means to identify exhibits that are physical objects by photograph, etc.). Had the government done so here, there would be no ambiguity and no need to engage in back-and-forth about whether the government's list permits the defense to identify exhibits accurately with a reasonable expenditure of time and effort. The government's continuing unwillingness or inability to provide comprehensive exhibit information through the present time is telling. The government's "offer" to "help the defense identify any item on the list that they could not identify on their own," Opp. at 3, was —

as the defense noted at the time — an empty gesture because the defense needs that information for nearly all of the government's listed exhibits.

With regard to exhibit items such as photographs and documents, the government states (Opp. at 2):

> When the government produced these items in discovery, it either produced them with these same original file names, or it produced them with a new file name consisting of a Bates number range and provided a searchable index that matched the new file name to the original file name.

For an enormous number of exhibits, this is simply not true. For example, many such items are listed without any digital file name that might facilitate location in the previously-produced discovery. A few examples include #791: "3D model of Boylston Street"; # 793: "Time Line" video – compilation video"; #876: "Daytime surveillance image of Koch Building courtyard"; #1075: "Notebook with writing"; and many others with similarly oblique names. As for photographic exhibits listed by computer file name ("*.jpg,"), contrary to the government's assertion, many of those computer file names are not listed in production indices that can be cross-linked to the Bates-numbered PDF images produced by the government in discovery.

The government's further claims that its proposed exhibits with "Q" numbers are readily identifiable and can be easily associated with photographs, Opp. at 2, are incorrect and beg the question of why the government did not do so itself, instead leaving the defense to attempt to cross-reference multiple lists and indices in an attempt to make a match. The vaunted report by FBI expert Ed Knapp, an excerpt of which is attached hereto under seal as Exhibit A, provides scarcely more information than the oblique

9

descriptions included in the government's exhibit list.[4]  The defense still has been unable to understand the significance of or locate photographs of many "Q" items, two weeks after receipt of this list.

With regard to files extracted from computers and other electronic devices, the government states (Opp. at 2-3):

> [T]he government's exhibit list identifies each computer and cell phone file by its file name. With limited exception, the defense has copies of all of the computers and cell phones in question and thus can examine the items simply by accessing the device in question and looking at the named file.

The second sentence of this statement contains a remarkable admission embedded in the "with limited exception" language:  apparently, the government has not yet even produced to the defense all of the seized digital devices from which its proposed digital file exhibits were extracted.  The remainder of the sentence is simply wrong.  Because the government has not identified the source device for each of its listed digital file exhibits, the defense must search every device produced in discovery for the named file.  As noted in the motion, many of these files appear on multiple devices and it is critical to understand which copy (associated with a particular device and/or person at a particular time) the government intends to introduce.  In addition, as also noted in the motion, the government's list contains nearly 3 dozen spreadsheets and other files of the government's creation that the defense has never seen.

---

[4] In many cases the Knapp list references *other* identification numbers that either require further cross-reference searches through terabytes of discovery or that have no meaning to the defense.

Even if the government finally does produce actual exhibits (and, in addition, identifies or produces the source device for each of the "digital file" exhibits, as applicable) by later today, the defense has now lost two weeks of informed preparation time with the start of trial now just one week away.

**Expert Witness Discovery**

The government's assertion that "the recently produced information was provided to illustrate for the defense the government's theory of admissibility," Opp. at 4, is disingenuous. It is significant that the recent government disclosures of additional materials and information regarding expert forensic testimony were made in response to (often repeated) defense requests for required Rule 16(a)(1)(E)-(G) materials. As just one example, the defense by letter dated November 24, 2014 specifically identified Rule 16 materials underlying proposed tape and polymer matching testimony that the defense did not have and would require in advance of the Court's deadline for *Daubert* motions. The defendant was forced to delay the filing of a motion *in limine* regarding tape and polymer matches because the government could not or would not timely respond. When the government finally responded on December 15, 2014, its responses tracked (albeit incompletely) the defendant's requests. Given these circumstances, the government's suggestion that the belated disclosures were simply "voluntary" or "illustrative," and/or were of the defense's own making strains credulity.

In any event, even a cursory review of the substance of the government's recent disclosures belies the notion that they are "illustrative" rather than "substantive." In response to the defendant's *Daubert* motion *in limine* regarding electronics testing, the

11

government revealed on December 15, 2014 that its testifying witness was conducting *new* testing that was apparently ordered to correct evidentiary flaws revealed by the defendant's discovery requests dating back to October 9, 2014.[5] Perhaps the most decisively refutation ofthe government's suggestion that the new materials are only "illustrative" is its addition, three weeks before trial is set to begin, of an entirely new expert (with two Ph.D's and a medical degree) to offer completely new opinion testimony in the highly technical area of DNA statistics. *See Government's Response To Defendant's Motion To Exclude Certain Conclusions Regarding DNA Evidence and Motion to Supplement Expert Disclosures*, DE__ (Motion to Seal [DE 728] Pending). The government's suggestion that new testing (in the case of electronic engineering testimony) and an entirely new expert that requires leave of the Court (in the case of DNA opinion) is "illustrative" rather than "substantive" is specious.

## Conclusion

For the foregoing reasons, as well as those set forth in the underlying Second Motion to Continue Trial Date and accompanying submissions (*i.e.*, the state of the international mitigation investigation, the atmosphere of fear that slows domestic mitigation investigation, the likely timing of jury deliberations on the current schedule, and unabated prejudicial publicity and leaks), the Court should grant a continuance.

---

[5] Notwithstanding the government's delay, which now spans two months, between request and its continuing responses, the government's most recent new disclosure is still incomplete because it is little more than a summary of the steps taken by the analyst. It does not contain documentation of the actual testing underlying his opinion.

Respectfully submitted,

DZHOKHAR TSARNAEV
by his attorneys

*/s/*   William W. Fick

Judy Clarke, Esq. (CA Bar # 76071)
CLARKE & RICE, APC
1010 Second Avenue, Suite 1800
San Diego, CA 92101
(619) 308-8484
JUDYCLARKE@JCSRLAW.NET

David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, VA 24450
(540) 460-8188
BRUCKD@WLU.EDU

Miriam Conrad, Esq. (BBO # 550223)
Timothy Watkins, Esq. (BBO # 567992)
William Fick, Esq. (BBO # 650562)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
(617) 223-8061
MIRIAM_CONRAD@FD.ORG
TIMOTHY_WATKINS@FD.ORG
WILLIAM_FICK@FD.ORG

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 29, 2014.

*/s/*   William W. Fick