UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|                                         |     |                    |
|-----------------------------------------|-----|--------------------|
|                                         | )   |                    |
| UNITED STATES OF AMERICA,               | )   |                    |
|                                         | )   |                    |
|     Plaintiff,      | )   |                    |
|                                         | )   | Criminal Action    |
| v.                                      | )   | No. 13-10200-GAO   |
|                                         | )   |                    |
| DZHOKHAR A. TSARNAEV, also              | )   |                    |
| known as Jahar Tsarni,                  | )   |                    |
|                                         | )   |                    |
|     Defendant.      | )   |                    |
|                                         | )   |                    |


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**LOBBY CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, December 30, 2014
10:35 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: William D. Weinreb, Aloke Chakravarty and
 3              Nadine Pellegrini, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Steven D. Mellin, Assistant U.S. Attorney
           Capital Case Section
 7         1331 F Street, N.W.
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         FEDERAL PUBLIC DEFENDER OFFICE
           By: William W. Fick and Timothy G. Watkins,
10              Federal Public Defenders
           51 Sleeper Street
11         Fifth Floor
           Boston, Massachusetts  02210
12         - and -
           CLARKE & RICE, APC
13         By: Judy Clarke, Esq.
           1010 Second Avenue
14         Suite 1800
           San Diego, California  92101
15         - and -
           LAW OFFICE OF DAVID I. BRUCK
16         By: David I. Bruck, Esq.
           220 Sydney Lewis Hall
17         Lexington, Virginia  24450
           On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2          THE COURT:  Good morning, everybody.

 3          COUNSEL IN UNISON:  Good morning.

 4          THE COURT:  I want to go over the jury procedures and

 5   the questionnaire in some detail, but I think we ought to start

 6   by, you know, me telling you what I think you expect me to tell

 7   you, which is the continuance and venue motions will be denied.

 8   They're not -- anyway, we'll issue a short opinion as to each

 9   eventually, but just so it's clear that we're going ahead.

10          So the list of veniremen was satisfactorily furnished,

11   I think yesterday?  Jim McAlear did a great job pulling that

12   together.  Let me just tell you a couple of things about it as

13   I understand them, and I'm subject to correction because some

14   of this gets complicated.  There are about 2,000 names on the

15   list and that is because it includes people who never responded

16   to the initial jury summons.  So if you look at the categories

17   on the list --

18          MS. CLARKE:  Status?

19          THE COURT:  -- under "status," if it says "summoned"

20   and doesn't say "responded," it means they haven't heard from

21   them.

22          MS. CLARKE:  And did they get their replacement

23   summons, do we know?

24          THE COURT:  The replacement summons only goes to

25   summonses that are returned as undelivered.  These are
</pre>

1    delivered but not heard from.

2            MS. CLARKE:  No responses.

3            THE COURT:  Jim tells me that his experience is that

4    some of those people will show up.  They'll obey the summons

5    having not obeyed the obligation to respond.  So there will be

6    some numbers -- so he's included them because some of those

7    people may actually show up.  And I guess if they do, they'll

8    show up -- they'll be treated in the order here.  They'll have

9    to go through the initial screening that everybody does for

10   qualification and so on and so forth to be in the real pool,

11   but that's -- and I think, I don't remember the exact number,

12   it's a several hundred number, which is why it gets up to near

13   2,000.

14           There are other people, a smaller number, somewhere in

15   the 200 range, who have requested generally, I think, to be

16   excused for one reason or another, doctors' letter, so on and

17   so forth, but have not furnished the backup information.  So

18   the jury clerk holds those.  If the person comes in with the

19   doctor's letter typically they're excused, but they're kind of

20   in limbo until the required information, maybe it's airplane

21   tickets to Guatemala or something like that.  So that's another

22   smaller number.

23           So if you take those two out, the number that we

24   thought we were going to have in terms of people who would

25   actually do the questionnaires is about 1,300.  That's about

1    where we are, okay?

2            MS. CLARKE:  Judge, do you know what these notes mean?

3            THE COURT:  Yes.  So if you want to look at ███████

4    ███████ it looks like, is Juror No. 3083.  That was his original

5    sequence.  But he replaced someone pursuant to the return

6    summons' reissue, second summons.  This is one of the

7    supplemental.

8            MS. CLARKE:  This is the second set?

9            THE COURT:  So whenever you see somebody was

10   replaced -- so it says this Juror 3083 replaced the one who was

11   '023 and he takes that spot, so he's Number '23.  That's the --

12           MS. CLARKE:  That was the summons return?

13           THE COURT:  Correct.  That's the supplemental summons

14   business.

15           MS. CLARKE:  Right.

16           THE COURT:  Okay?

17           MS. CLARKE:  Thank you.  That helps.

18           One other question on this:  Apparently the jury clerk

19   can provide it in Excel format if the Court authorizes it.  And

20   I don't know -- the government would probably like to have it.

21   It's just easier to work with the names if we have it in Excel.

22           MR. WEINREB:  Yes, we would like that.

23           THE COURT:  I'll check on that.  I suspect he operates

24   that way himself.  I think he suggested putting this in PDF,

25   and I thought that froze it, which was a good thing because it

1    is fluid.  You know, if he ran it today there would be some

2    changes.  So maybe the thing to do is --

3             MS. CLARKE:  If you can provide it --

4             THE COURT:  Well, they're not going to be huge

5    changes, but for the same reason:  Somebody will come in with a

6    doctor's letter and they'll get excused so they'll go up.  No

7    one will get added to the list who is not already on it; the

8    only thing that will happen is people will get eliminated.

9             MS. CLARKE:  It might shrink.

10            THE COURT:  Right.  But it's fluid.  So if he ran it

11   again you would get a slightly different list.  So he could

12   give you an Excel, but it has a sell-by date.

13            MR. WEINREB:  That's fine.  It's just for purposes

14   of -- it's easier to add information if you have extra columns

15   on an Excel spreadsheet.

16            THE COURT:  We'll talk to him about that.  I think he

17   can do it.  Again, I think the reason that I agreed with him it

18   was better to do it this way, it gave you a fixed --

19            MR. WEINREB:  Sure.  Initially that makes sense.

20            THE COURT:  Okay.  We have a draft order regarding the

21   selection procedure.  I think we've talked a little bit about

22   this.  We wanted to give it to you yesterday but Jim was still

23   looking at it and I just wanted to make sure he saw it.  But

24   subject to -- actually, maybe we should just -- can you quick

25   run it off and we'll come back?

1          LAW CLERK:  Sure.

2          THE COURT:  It might be just helpful to do it.  I

3    should have thought about bringing in extra copies.  It's

4    possible we'll make changes to it if Jim has technical

5    suggestions for it.

6          You've submitted jointly, I think, largely proposed

7    preliminary instruction and proposed questionnaire, and I want

8    to spend some time going through the questionnaire.  I have

9    some things I want to talk about.

10         With respect to the preliminary instructions, I'm

11   going to work with them a little, say things my own way and so

12   on.  So I'll try to get you the version I will use for both,

13   before the questionnaires and then before the actual voir dire,

14   by Friday so you'll know it before Monday.  But it will be a

15   meld of some others.  As you know, we've had a lot of

16   experience with questionnaires and instructions about them

17   lately, and so we'll meld something together.

18         Have you seen the -- I think it's called the "Call to

19   Serve" video that all jurors are shown for all of our cases?

20   It's part of the orientation in the morning.

21         MS. CLARKE:  No.

22         THE COURT:  If you have a chance, it would be good to

23   review that, see what you think.  It's kind of anodyne.  You

24   have -- it's introduced by the chief justice about the

25   importance of jury service, and then there's commentary by

1    Justice O'Connor and Justice Alito going back and forth and so

2    on.  And then there's -- this is produced by the Federal

3    Judicial Center -- an FJC person who describes in general terms

4    what the features of jury service are.

5         It was produced in 2009 so it's reasonably current.

6    One thing that is inaccurate about it is that it presents voir

7    dire as something conducted by the lawyers, which is not our

8    practice.  I was actually surprised that it didn't say in some

9    jurisdictions it's done this way and in some jurisdictions it's

10   not, but I think that's probably a minor thing.  And then they

11   have some sort of interviews with people who are, said to be,

12   at least, actual jurors talking about their experience and so

13   on.  It's kind of interesting.

14        But you should see it before -- we make sure

15   everybody -- so, I mean, if there's any problem with showing it

16   to people, we should deal with that.  That's all.  It's about

17   20 minutes long.

18             MR. CHAKRAVARTY:  Judge, is that available through the

19   clerk's office?

20             MR. WEINREB:  I think it's on the website.

21             THE COURT:  It might be on the website.  I believe the

22   title is "Call to Service."  You know where it is almost

23   certainly is on the FJC website.  But Jim, again, could direct

24   you to it, I'm sure.

25             So anyway, in outline, we're getting 200 Monday

1    morning, 200 Monday afternoon, same Tuesday, same Wednesday.

2    We'll have at least 1,200 questionnaires, I guess, as I point

3    out.  You know, again, the number 200, some extras will show

4    up, some won't show up, some will be expected to show up on

5    Monday -- well, or the other way around, I guess.  Some will be

6    expected to show up perhaps on Tuesday but they'll show up on

7    Monday.  It's messy.  So the number is not a fixed number.

8    That will be approximate.  So we've called them Panel A, B, C,

9    D, E, F.

10            Here's the draft.  So this just sets out the

11   procedure.  They'll come in, receive the instructions, they'll

12   be asked to do the questionnaire, they'll be collected.  The

13   person will leave then with instructions to return as they

14   learn it from a call-in number that they would get.  Again,

15   this is what is standard procedure for smaller cases as well.

16   So on the 5th it will be A and B, and then the 6th will be C

17   and D, and then E and F on Wednesday.

18            So if you look at Paragraph 3, the jury clerk people

19   will then -- they will actually process the paper by writing

20   the juror number on each page.  The reason for that is they've

21   had some experience with -- on occasion somebody drops a pile

22   of them and they get scattered, so you'll know how to

23   reassemble them.  All of the filled-out questionnaires are then

24   sent to a vendor who scans them onto a disk, and that will be

25   provided to counsel for each of the panels.

1          I'm not entirely sure of the timing on that.  I think

2     they get them by the end -- well, I say "the end of the day."

3     Panel A will be ready by the end of the day; Panel B, the

4     afternoon Monday panel, may not be available until Tuesday

5     morning.  That might be an overnight process.  I think that's

6     probably the way it is.  And it will follow that pattern.  For

7     the C panel on Tuesday morning, you should have it by the end

8     of the day on Tuesday, and at least the D panel by Wednesday

9     morning.

10          So for the A and B people -- again, this is not my

11    invention; this is the Bulger method that Judge Casper devised

12    that seemed to work out very well.  The parties will then

13    confer -- review it themselves first, and then confer and agree

14    likely on people who should be excused.  For a list of people

15    the parties agree on to be excused, I don't even want to look

16    at them.  I'll take the agreement, which is what she did.  And

17    that we would ask for -- the Monday panels by Thursday noontime

18    roughly.  So this is a rolling process.  Tuesday we do it on

19    Friday, for the Wednesday, we do it on Monday the 12th.

20          We will then have reduced it by all the people you

21    agree should be excluded, and that will be a significant

22    number.  The rest we'll submit, then, to individual voir dire.

23    We won't target only those that one side or the other is

24    especially concerned with; that will come up in the process.  I

25    think it is beneficial for everybody for every juror to appear

1    and say something just so we get a sense of the person.  So
2    even if there's somebody who looks like an ideal juror on the
3    basis of the questionnaire, we'll think up of something to ask
4    him or her, okay?  And then we'll also ask the problem
5    questions to people.

6        So what the process asks for is you to tell us -- this
7    is in the middle of Paragraph 5 -- what particular answers
8    you're concerned with about jurors who are still in the pack.
9    Identify the juror number and -- you can just say "Question 35"
10   or something like that, and then when we do the voir dire we
11   can -- if you want to add more, if you want to say "Why
12   Question 35," that's fine.  It's extra work.  But I think
13   mostly it will be obvious from the question.

14       And then so -- so when all of that's finished, we will
15   begin the process of calling them in -- Paragraph 6 says "as
16   soon as practicable," so I'm leaving that date a little bit
17   open.  They'll come in, and we'll call 20 in the morning and 20
18   in the afternoon.

19       I don't know if there are -- did he talk about
20   Courtroom 6?  Yeah.  "Reports to Courtroom 6."  So the way the
21   20 will come in, they'll come directly to Courtroom 6, which is
22   on the same floor as Courtroom 9, and they'll assemble there,
23   and that's where I will give the group of 20 a second wave of
24   preliminary instructions.  And that will be about the unique
25   circumstances of a death penalty case, two phases and so on and

1    so forth, you know, substantially.

2          So we'll do the preliminary, and then we'll call them

3    one by one into the courtroom.  And, again, following Judge

4    Casper.  Judge Casper had the courtroom rearranged to a

5    conference table like this basically.  She sat in the well of

6    the court.  Using this as an example, defense would be down

7    there, prosecution would be down there, there would be a couple

8    of empty chairs, I think Judge Casper was there, stenographer

9    there, and the juror will be here.

10         It would be, like other proceedings, televised to the

11   overflow courtrooms, but it would be done from behind the juror

12   focusing perhaps on -- and we can work out the exact physical

13   layout, but I think focusing principally on Judge Casper, and

14   then if a lawyer asked a question.  But it would not show the

15   juror except the back of the head basically.  Jurors are going

16   to be identified by number.

17         If the juror had something especially confidential to

18   talk about, they kill the audio.  They kept the video but they

19   shut down the audio so that people in the room would hear it

20   but the overflow would not.

21         In the last several years the circuit has had several

22   cases concerning closing of courtrooms to the public, and

23   there's some concern about the dimensions of that rule.  I

24   myself don't quite know where the line is drawn.  I'm told by

25   Judge Casper that defense counsel in the Bulger case asked that

1    five members of the public be in the courtroom so that it was,

2    to some extent, open to the public, the concern being if it was

3    only televised, only sent to the other courtrooms, that there's

4    some hazard that the Court of Appeals might conclude that was

5    not public.  So as a precaution, they agreed to have five.  I

6    don't know how they were selected, and that's something we

7    might think about.

8            I suggest we do it as a safety measure.  And exactly

9    how we do it, we still have some time to figure it out, I

10   guess.  It could be random, it could be that just like the

11   seating for the courtroom generally, we designate one seat for

12   a victim, one seat for a media person, one seat for defendant's

13   family.  And we could do something like that so that it's a

14   mini courtroom.  But anyway that's something.

15           But anyway, so in that format the juror would come in,

16   be asked the questions.  Again, if it was confidential, the

17   audio would go down.  And then after each one there would be a

18   decision.  If there was a motion by either side to strike for

19   cause, that would be decided right then.  The juror would go

20   back to the courtroom before the discussion, obviously.  And at

21   the end of the session, in the morning, you know, ten people

22   would be excused for cause, ten people would be told to go

23   home, call this number, wait for what happens next.  So that's

24   generally the process, and we'll do that until we have enough

25   people.  My guess is the process will take us into the third

1   week.  It would be nice if it didn't, but we'll do what we have

2   to do.

3          So that sort of dovetails with, you know, some of the

4   concerns defense has expressed about adequate trial

5   preparation, and I think some of those are valid concerns.  I

6   think it would be helpful to everybody, including the defense,

7   if the government were able to tell us substantially in advance

8   what the order of witnesses is likely to be realistically.  And

9   my suggestion is this:  That actually by Friday -- I assume

10  you've thought about this and know who you want to call -- that

11  you could tell us -- not only the defense but I would like to

12  know too -- who and in what order would be the witnesses for

13  the first two weeks of trial.  Sketch it out, what your plan

14  is.

15         Plans get deviated from.  We'll adjust to that.  But

16  if -- I think it will reduce the anxiety and the effort on the

17  defense part if they know they have to deal with Mr. Smith as

18  the first witness.  I think it would be helpful if the exhibits

19  expected to be used with Mr. Smith were also disclosed in

20  connection with that.

21         Now, while I'm on the subject of exhibits, I guess, at

22  some point -- and I think it's Friday we talked about for me,

23  anyway, you were going to give me a disk -- with all of the

24  exhibits.  I assume the defense is going to see all the

25  exhibits on the disks?

1           MR. WEINREB:  Yes, your Honor.  They're actually --

2           THE COURT:  And that will be, then -- if it were a

3    smaller case, it would be like the JERS list?  I don't know.

4    Have you done a JERS trial?

5           MR. WEINREB:  A JERS trial?

6           MR. CHAKRAVARTY:  JERS.

7           THE COURT:  J-E-R-S.  In the beginning the parties

8    usually jointly, it won't be the case here, produce a disk

9    that's loaded into JERS which has all the possible exhibits for

10   either side, and then they're admitted and sent to the system

11   as they're admitted and so on.  I think we talked about it.  I

12   know I talked to the clerk about possibly not doing that,

13   trying to do that all at the beginning of the case because of

14   the volume, and we would on some schedule -- it could be just

15   at the end of the case or maybe it could be periodically during

16   the case -- put in those that have actually been admitted.

17          It's customary, as I'm sure you know in any case, that

18   there will be a list of 100 exhibits, and 38 get admitted

19   actually, you know.  So anyway -- but that mass list for the

20   government's will be such that if you see Smith is going to

21   talk about Exhibit 38, you can go to this and find Exhibit 38

22   and see what it is.  Is that right?

23          MR. WEINREB:  So last night we -- late last night we

24   emailed the defense a spreadsheet with all of our exhibits.

25   They're not numbered yet, and that's on purpose because there

1    are a few -- you know, we may rearrange them somewhat or add a

2    few here or there, and we don't want to confuse things with a

3    numbered list that is going to change.  However, we also -- the

4    list generally has a description of what the exhibit is, like

5    it will say "Photo of Boylston Street," and then a file name,

6    which is perhaps the JPG file, because the vast number of our

7    exhibits are digital.  Whether we present them digitally in the

8    courtroom or print them out and put them up on a big piece of

9    cardboard, we have them digitally.

10            So all of those digital exhibits are, as we speak --

11   the process began last night but it's continuing this morning,

12   but are being burned to thumb drives.  And we'll produce those

13   to the defense.  We may have them before this meeting is over

14   because we know the Court wanted one too.

15            So it should be possible for the defense to simply

16   consult the spreadsheet, say, Oh, you know, photo of Boylston

17   Street.  I would like to see what that is, the file name is X,

18   simply search the directory on the thumb drive for that file

19   name and they'll have it right there.

20            The only caveat I would say is that there's some of

21   them that we don't have yet either because they're things that

22   have to be scanned and they haven't been scanned or they are

23   files that for one reason or another we couldn't put our hands

24   on.  But the vast majority of them are there -- 90 percent of

25   them are there, and we'll supplement them as we have them.

1          And then to the extent there are physical items, the

2     defense has had an opportunity to look at those.  We have

3     identified them -- and because there was a great deal of

4     evidence in this case, and the FBI was trying to track it as

5     well as state police according to what they seized, various

6     numbers were given to pieces of evidence over time.  And we've

7     tried to provide the defense with as many of those numbers as

8     possible so that whichever system they find the most convenient

9     to use, they can use.

10         But to the extent that the defense doesn't know what a

11    particular number corresponds to, we'll work with them.  They

12    can just ask us.  So it will say something like "BBs recovered

13    from Boylston Street" and then a Q number, Q35, which is what

14    the lab in Quantico assigns to things that go down to the lab,

15    gives them a Q number.  There are photos of virtually all of

16    the Q items that have been previously produced to the defense

17    and should be possible just by looking at the photos to see

18    what it is.  But if they don't know what it is, and when they

19    know what it is, then we'll figure out a way to get that

20    information to them.

21         THE COURT:  Okay.  And associating exhibits with the

22    list of the expected first witnesses?  You know, I mean, this

23    doesn't have to be perfect.  Things shift around and you decide

24    maybe I won't use that exhibit, I changed my mind, I'm going to

25    use -- but if it's, you know, 95 percent, that would be

1    helpful.

2         MR. WEINREB:  We could do that, your Honor.  We had

3    struck an informal agreement with the defense that the next

4    day's lineup of witnesses would be provided 24 hours ahead of

5    time.

6         THE COURT:  Right.  And that -- that doesn't preclude

7    the other -- in other words, that's the last -- I said at the

8    pretrial conference I was surprised that the local rule

9    provided seven days, but I'm thinking about it and thinking

10   about what the defense has said about their ability to follow

11   things.  I thought maybe it does make sense to have some

12   advance notice, not with the intention of making it rigid so

13   that if you want to call somebody out of order it becomes, you

14   know, forbidden because you didn't disclose it two weeks in

15   advance.  I mean, this is really a practical accommodation to

16   help things go smoothly.  And so that if there's some reason

17   why there's some small change or a witness gets pulled -- I

18   mean, you know, it happens too in cases, you decide you don't

19   need them after all.

20        It's all subject to change.  And so, you know, the

21   last minute, "This is what tomorrow's agenda is" would still be

22   helpful, but if there could be some preview so that, you

23   know -- I mean, it tells us to some degree the topics that will

24   be talked about and so on and so forth.

25        MR. WEINREB:  So we don't object to that; we just ask

1    that it be reciprocal.  So when the time comes, we have a

2    lineup of who the defense is going to be calling more than 24

3    hours in advance.

4            THE COURT:  Yeah, I don't see any problem with that.

5            MR. WEINREB:  We can provide -- it's a little hard to

6    estimate what the first two weeks is going to be.

7            MR. CHAKRAVARTY:  And how fast we'll be proceeding.

8            THE COURT:  Sure.  That's right.  That's right.  But

9    we'll -- it at least separates out six witnesses from 700

10   whatever.

11           MR. WEINREB:  Yes.  Yes.  Certainly we can do that.

12           THE COURT:  Just before I forget, on the witness list,

13   could you produce for us a joint witness list that we can

14   attach to the questionnaire?  I just don't want to forget that.

15   At some point.  Again, actually, logistically it would be good

16   to have it Friday so they could do whatever processing they

17   need to do down in jury.  But obviously there will be a witness

18   list attached.  Okay.

19           MR. WEINREB:  Your Honor, with respect to the question

20   of who is going to be in the courtroom during the individual

21   voir dire, were you envisioning that we would meet and try to

22   agree on that?

23           THE COURT:  Yeah.  See if you have any thoughts about

24   that.  Yeah.  Now, there's one particular person I'm wondering

25   about, and that's the defendant.  Do you expect him to be

1    present at the individual voir dire?

2        MS. CLARKE:  We don't want the government making an

3    issue of him not being present.

4        MR. WEINREB:  We would request that the defendant be

5    present.  The jurors are going to be asked whether they could

6    give somebody the death sentence.  They need to see him in the

7    courtroom, this is the person they would be sentencing to

8    death, or they're not going to be able to say whether they can

9    do it or not.

10        THE COURT:  I've done it in other cases -- non-death

11    penalty cases, I've done it both ways.  In the Mehanna case, he

12    sat right there while we did it.  I've had some child

13    pornography cases where defense counsel have not wanted the

14    defendant there to disturb witnesses.

15        MR. WEINREB:  I also would have a concern in a capital

16    case that if the defendant is not there, that it's going to

17    create an issue for appeal.

18        THE COURT:  Yeah, I think it's a better course.

19        MR. BRUCK:  It is waivable.  There's case law.  If

20    there's a knowing and intelligent waiver, the courts have

21    accepted it.

22        THE COURT:  You know, I guess I have to look at

23    whatever the relevant law is.  I think it is advisable that he

24    be present.  I don't know that I can order it against his

25    decision.

1          Do you think I can do that?

2          MR. WEINREB:  We would have to brief that, yeah.

3          THE COURT:  But, again, that will be for the --

4    principally an issue for the individual voir dire.  I assume he

5    will be present at the preliminary pre-questionnaire questions.

6          MS. CLARKE:  In the jury room?

7          THE COURT:  In the jury assembly room.

8          MS. CLARKE:  That is what we've been told, is that he

9    will be present.

10         THE COURT:  Yeah.  Yeah.

11         MS. CLARKE:  Judge, can I ask a question about one of

12   the procedures?  It seems like Monday we agree by Thursday,

13   Tuesday we agree by Friday, and Wednesday by Monday.  So the

14   Wednesday jurors, which may be jurors we'll never get to, we

15   have the most time to actually work with.  I wonder if the

16   Court would consider letting us do Monday on Friday and Tuesday

17   and Wednesday on Monday.  It gives us a little more time with

18   the first 400.

19         THE COURT:  Yeah, that's okay with me.  That's okay

20   with me.  That might be a little less compressed.  I think that

21   will pretty much guarantee we won't finish in the second week

22   because if we don't -- if the first day of voir dire -- well --

23         MS. CLARKE:  You would still be doing excusing --

24         THE COURT:  We'll have to see.  I don't know.  We'll

25   see when we start the voir dire.  I mean, we'll, I guess, have

1  some experience by the beginning of that second week as to how

2  much time the respective players here are involved in what's

3  going on.  In other words, our involvement Monday, Tuesday and

4  Wednesday will essentially be for half an hour or an hour

5  twice -- half an hour twice, and then we're out of it while the

6  jurors do their questionnaires.

7       MR. WEINREB:  Still, we actually are with the defense

8  on this one, that 400 questionnaires --

9       THE COURT:  No, that's fine.  Friday rather than

10  Thursday is fine.

11       MR. WEINREB:  I would go even further, though, and say

12  that I think the most taxing part of this, from the parties'

13  perspective, is going to be just managing the sheer quantity of

14  data from all those questionnaires, boiling it down to what we

15  really care about and trying to calculate -- figure out who

16  needs to be excused or so on, and that I'm concerned that this

17  schedule is so compressed that we're not going to be able to do

18  it.

19       And so I guess we would ask that the process of

20  submitting the joint strikes based on the questionnaires begin

21  the following Monday.

22       THE COURT:  Yeah, fine.  Let's take the time to do it.

23  That's fine.  I guess --

24       MS. CLARKE:  I just wasn't quite that brave.

25       THE COURT:  -- my original hope was that we could do

1    this all in two weeks but I think that's probably not -- I

2    think we're going to go into the third week, so let's not fight

3    it.  So we'll change the dates from Monday, Tuesday and

4    Wednesday.

5           But it may be that, having reduced the Monday people,

6    we're ready to start asking them questions on Thursday.  So I

7    think -- and actually, maybe even, I haven't thought this

8    through at all, maybe even Tuesday.

9           MS. CLARKE:  That's while we're still looking at

10   questionnaires to excuse?

11          MR. WEINREB:  That's going to be a full-time job for

12   quite a few days, looking through those questionnaires.  I

13   mean, we have to meet over the joint strikes.  Surely there is

14   going to be some disagreement.

15          THE COURT:  Fine.  Yeah.  Okay.  But I think Thursday

16   would probably be the target, then, for the Monday people,

17   because then the list will have been reduced by --

18          MS. CLARKE:  I'm lost on your Thursday.

19          THE COURT:  -- the joint cause.

20          MR. WEINREB:  So it's going to be a week from

21   Thursday.

22          MS. CLARKE:  So the Monday people -- Monday, January

23   5th people --

24          MR. BRUCK:  Would come back a week Thursday.

25          MR. WEINREB:  A week Thursday.

 1             THE COURT:  Correct.

 2             MR. MELLIN:  On the 15th.

 3             MS. CLARKE:  And we would meet with you on Monday, the

 4    12th, to --

 5             THE COURT:  Meet or submit.  I don't know that we need

 6    to meet if it's going to be joint.

 7             MS. CLARKE:  Okay.  So the Monday people Monday,

 8    Tuesday people Tuesday, Wednesday people Wednesday, start voir

 9    dire on the second Thursday.

10             MR. BRUCK:  Which is the 15th.

11             THE COURT:  Yeah.  Yeah.  Okay.  So let's look at the

12    questionnaire.  I think I said it about the preliminary

13    instructions, that I'm going to -- that is preliminary

14    instructions to -- orally to the people filling out the

15    questionnaire, I'm going to fiddle with it.  There's some

16    introductory language in the proposed form that we may change,

17    again, to more or less conform to what was used in the Bulger

18    case.  I like it a little better in terms of how it sets it

19    out.  It also happens to be -- I don't know if this is on the

20    docket or not, but it happened to be the form that was used in

21    Phillipos and Tavhayakov.  And I think there's actually some

22    value in following what other judges have done in this respect,

23    so that there's some predictability in future cases with this

24    kind of the mass intro to the questionnaire.  It's not always a

25    controlling reason for anything but it might be convenient and

1   where it's -- you know, the substance is going to be the same;

2   it's how it's phrased, is really the issue.  So that part will

3   probably change.

4        So let me just go through and -- I take it that

5   because this is jointly proposed neither of you have any issues

6   with any of the questions anymore?

7        MR. WEINREB:  Are we talking about the instructions or

8   the questionnaire?

9        THE COURT:  The questionnaire.

10       MR. WEINREB:  I actually only had one issue, which is

11  when we were drafting the questionnaire with the defense, it

12  was on the assumption that there would be a -- there would

13  still be some kind of group voir dire process where the

14  standard -- so-called standard voir dire questions would be

15  asked orally notwithstanding the questionnaire, and normally

16  those wind up with the jurors being asked, "Notwithstanding

17  whatever you've just answered yes to, could you still be fair

18  and impartial?"  And it's only the ones who say that they did

19  not believe they could be who are actually given follow-up.

20       So, for example, you know, "Do you have a relative or

21  anybody who is a lawyer or in law enforcement?" and then

22  they're typically asked, "Would that prevent you from being

23  fair and impartial?"  And if it wouldn't, there's often no

24  follow-up.  But now that it's clear that the process is there's

25  not going to be any group voir dire, we're simply going to have

1    individual voir dire, those kinds of questions about whether

2    the jurors could be fair and impartial really weren't put into

3    the questionnaire.  The questionnaire just seeks the underlying

4    information but it doesn't ask that question.  So that's the

5    only --

6            THE COURT:  Yeah, my thought is that since we're going

7    to see everybody and somebody has answered that their uncle was

8    a Boston cop, that's something that can be flagged:  Ask Juror

9    No. 35 about his uncle.  So I think we can -- and the oral

10   question could be, "Notwithstanding that, would you be able to

11   judge the evidence fairly and impartially without regard to

12   your family relationship?" or something like that.  We can put

13   that in.  I agree that those questions, as appropriate, should

14   be asked, but I think this process will serve us.  In other

15   words, put another way, I think the kinds of questions that in

16   a normal case we would ask the venire as a whole are in here,

17   so I will get the "yes" answers by the questionnaire, and the

18   follow-up can then be on those "yes" answers as appropriate.

19           MR. WEINREB:  Very well.

20           MS. CLARKE:  That makes sense.

21           MR. WEINREB:  That's fine.

22           THE COURT:  So let's kind of walk through it.  And I'm

23   going to -- this is on page -- the pagination is different.  Is

24   it the same?  Okay.

25           Page 4, the question -- the very first question -- it

1  may be, and we're going to consult with the jury people about

2  this, there's a face sheet that has the juror's name, and the

3  juror number is going to go on every page.  It may be advisable

4  not to have the name in the body of it.  What that does is

5  if -- sometimes these have to become public, we could take off

6  the first sheet and have the body later and it doesn't have the

7  person's name.  So I think it will work if just the top

8  sheet has the name.

9          I had a question about Question 4, race.  I mean, it's

10  certainly not an issue in this case.  I don't know if it's

11  important to ask that question or not.

12          MR. WEINREB:  One of the --

13          THE COURT:  You're going to see all the jurors.

14          MR. WEINREB:  Well, one of the reasons it's useful to

15  have that information is if there's a *Batson* challenge.

16  Without knowing the juror's race --

17          MS. CLARKE:  I think that's right.

18          THE COURT:  All right.  Some of these -- some

19  questions we may just want to rework the language.  The concept

20  will be the same.  Question 6 is an example:  "How long have

21  you lived there?"  Some of the questionnaires we've surveyed

22  have asked it slightly differently.  "If you lived at that

23  location for fewer than X number of years, could you tell us

24  where you lived the prior Y number of years" or something like

25  that.  So if somebody just moved to town and, you know, they

1  lived here for a year, but they lived in Colorado before that,

2  we would want that information.  So we may reword that.

3          Do you want to -- she's kindly asking you if you -- I

4  don't know if you brought a copy of the questionnaire.

5          MR. CHAKRAVARTY:  We don't have a copy.

6          MR. WEINREB:  We were --

7          MR. CHAKRAVARTY:  If it's useful to your Honor, then

8  yes.

9          THE COURT:  Yeah, it might be useful to all of us.

10  Jane can go get you a copy.

11          Let me see if there are other non-questionnaire things

12  we can talk about until she comes back.

13          With respect to exhibits, physical exhibits.  And I

14  learned that you have a mock -- well, I saw it on the list.  A

15  mockup of Boylston Street.  Has the defense seen that?

16          MR. WEINREB:  I don't believe so.

17          THE COURT:  Well, you're going to want to use that

18  fairly soon so you should -- any chalks or models, whatever,

19  make sure that you've cleared any controversy while it's still

20  practical to clear it.

21          Does the witness list -- I'm sorry -- the exhibit list

22  include chalks?

23          MR. CHAKRAVARTY:  It does not include chalks.  Some

24  are kind of these hybrids; they could be considered a chalk,

25  but there will be additional chalks.

 1          THE COURT:  Right.  So that goes for all of them,

 2   however many there are?  The defense will need a chance to take

 3   a look at them.

 4          It's my inclination, unless somebody feels strongly

 5   otherwise, that jurors should be permitted to take notes.

 6          MR. WEINREB:  No objection to that.

 7          THE COURT:  I think by the third week they'll stop, if

 8   they last that long.  The jurors -- I don't know if

 9   you've -- we've talked about this before.  We've made

10   arrangements with the Marshals Service for the jurors to

11   assemble at a remote location and to be brought together --

12   brought to the courthouse together to come into --

13          MS. CLARKE:  And separately from the victims?

14          THE COURT:  Yes.  Yes.  There may be two locations.

15   They may vary them for security reasons.  But that way the

16   jurors will come into the basement of the building all at once.

17   We're sensitive to that concern, about victims and so on, and

18   they'll come upstairs.  And they'll never leave the back of the

19   house, as we say, for lunch or anything like that; they'll have

20   to suffer through Gourmet lunches every day for however long.

21   And then they'll leave and go back to where they came from at

22   the end of the day together.  Therefore, they won't be mingling

23   with anybody in the cafeteria or trying to come in in the

24   morning the way a normal jury would.  So hopefully that will

25   work smoothly.  The Marshals have seemed to have worked it out

1    pretty well.

2         I think we had an inquiry from somebody in the press

3    about access to admitted exhibits.  And I don't know if

4    you -- both sides have talked about that.  Typically what's

5    happened is -- first of all, typically in a criminal case, most

6    of the exhibits are government's and so the press typically

7    gets them from the government.  Just -- there are going to be

8    people looking for access to exhibits, and I think we can limit

9    it to admitted exhibits, in other words --

10        MS. CLARKE:  Well, certainly the public shouldn't get

11   non-admitted exhibits here.

12        THE COURT:  Right.  Right.

13        MR. WEINREB:  So, your Honor, it's been in

14   high-profile cases like this one where the press has a strong

15   interest in the exhibits, the government has typically

16   accommodated them by uploading admitted exhibits to a website

17   where they can download them at the end of the day.  Just the

18   admitted exhibits, obviously.

19        We did discuss this with the defense because in this

20   case there are certain exhibits that are going to be admitted

21   that we think would -- and we know because we've been told by

22   the victims, will cause them tremendous distress if they became

23   public, visions of their children being killed and maimed, and

24   so we don't intend to release those.

25        THE COURT:  That's an issue I think not only with

1    respect to the feelings of the victims but generally what

2    should be available.  I don't know how to draw those lines

3    neutrally and consistent with First Amendment considerations.

4    We'll have to give that some thought.

5         MR. WEINREB:  So what we anticipate happening is we

6    will not make certain exhibits public.  We're going to try

7    to -- because we independently, by law, have an obligation to

8    try and make trials as open as possible.  We will be erring on

9    the side of caution here, but at a minimum the graphic exhibits

10   of -- certain graphic exhibits and all the ME photos we intend

11   not to release, and what we anticipate is that at least one or

12   more news organizations will probably file a motion with the

13   Court seeking their release.  And that will essentially

14   trigger, you know, litigation and eventually a ruling.  And

15   that's the posture in which the issue will arise.  So that's

16   what we anticipate happening.

17        MS. CLARKE:  Bill, have you thought marking on the

18   exhibit list that you're sharing with all of us the ones you

19   believe should not be made public?  Have you made that cut

20   already?

21        MR. CHAKRAVARTY:  We haven't, but I believe we could

22   do that.

23        MR. WEINREB:  We could certainly do that.

24        MS. CLARKE:  We've already agreed to whatever position

25   you want to take.

1       MR. WEINREB:  Yeah.  Yeah, we're happy to indicate

2  which ones won't be made public.

3       THE COURT:  Let's see.  My notes have a question about

4  witness sequestration during the trial, but I don't know if

5  it's going to occur.  But I expect that's what you expect, is

6  that people will be sequestered before they testify.

7       MR. WEINREB:  With the exception of the victims who

8  have a statutory right to be in the courtroom notwithstanding

9  any sequestration order.

10       THE COURT:  Fair enough.

11       MR. CHAKRAVARTY:  We also have --

12       THE COURT:  I've forgotten the number of -- well, I

13  guess there could be an overflow.  I'm sorry.  I was thinking

14  the courtroom only, but you could see the testimony through the

15  overflow.

16       MR. CHAKRAVARTY:  Your Honor, for case agents and

17  theoretically for expert witnesses, although I don't anticipate

18  expert witnesses for the government sitting through the whole

19  trial, we would ask -- I think there are three case agents in

20  this case.  We would ask that all of them be able to -- I don't

21  know how many of them are going to be testifying but we

22  normally have -- in a case of this volume, we need more than

23  one.

24       THE COURT:  Any objection to that?

25       MR. BRUCK:  No.

 1          THE COURT:  I think three's an okay number.

 2          MS. CLARKE:  Right.  If they would identify the

 3   individuals.

 4          THE COURT:  They'll have to be identified.  No doubt

 5   about it.  Right.  Absolutely.

 6          MS. CLARKE:  And perhaps -- it seems if the government

 7   or the defense wants an expert present, we can notify the other

 8   party, and if there's an objection, raise it with you.

 9          THE COURT:  Right.  So we're going to be very tight at

10   the beginning.  I suspect -- I was more involved than I wanted

11   to be in deciding which media outlets would have access to the

12   courtroom -- we had to displease some people.  But even then I

13   suspect all those who said we'll be doing day-to-day coverage

14   won't actually, so then the courtroom will loosen up a little

15   at some point after the first couple of weeks probably.

16          Just so you know, we have a pretty wide representation

17   of media, for what it's worth.  We pretty much tried to get all

18   the local media courtroom access, and we have some of the major

19   national outlets, particularly those that are affiliated with

20   groups like *Tribune* papers and things like that, *Gazette*.

21          In the courtroom there are only three international,

22   we've said could have -- expect to have access regularly to the

23   courtroom.  And I forget the name of the outfit but it's from

24   Russia, four initials.  I forget what they are.  I don't know

25   if it's a TV station or something.  And then the BBC and *Agence*

1    *France-Presse* where indicated.

2            Okay.  Back to the questionnaire.  We've treaded water

3    while you were gone.

4            LAW CLERK:  Sorry about that.

5            THE COURT:  So again, I think similarly, just fiddling

6    with some of the language on 9 and 10, based on what we've seen

7    in other questionnaires, with respect to Question 10, one

8    suggestion I would make as an addition to that, if the person

9    identifies a condition that might affect the person's abilities

10   in some way, whether some accommodation could be made to

11   overcome that problem.  I've had, you know, people in

12   wheelchairs sitting in the jury, we've had -- I've had deaf

13   jurors who have sign language, so I think we should ask the

14   accommodation question.

15           We may expand a little bit a description of the trial

16   in Question 11.  Question 13, single, married or living with

17   someone.  A couple of the other questionnaires included other

18   possible categories or put the categories this way:  Married,

19   single, separated, divorced, widowed, and then the last one was

20   civil union/domestic partner.  We don't need to use the

21   expanded list, I guess, just for whatever additional

22   information.

23           One question we had on Question 14 was whether it was

24   necessary to have the names of the people or it was sufficient,

25   so in the example, just say:  Ex-wife, BA in physics, engineer,

1    or if you need the names.  Again, this is just a privacy

2    matter.  These people aren't even jurors.

3            MR. MELLIN:  I don't think we need names.

4            MR. WEINREB:  I think we may have added that.  It only

5    asked for first name, and it's just for the convenience of

6    being able to refer to -- if somebody has been married several

7    times, they may have more than one ex-wife or ex-husband.

8            MS. CLARKE:  It could be Linda 1 and Linda 2.

9            (Laughter.)

10           MR. WEINREB:  But it just seemed like we should ask

11   for a first initial.  It just seemed convenient but --

12           THE COURT:  It was just a privacy issue, that's all.

13   I don't know if the information content was worth the

14   specificity.  You know, I'm expecting at some point these are

15   going to be public somehow, and so we ought to just keep that

16   in mind.

17           MR. WEINREB:  We don't feel strongly about it, if the

18   Court wants to strike that name category.

19           MS. CLARKE:  If we want some laughs we could say, "How

20   do you refer to that person?"

21           (Laughter.)

22           THE COURT:  On the questions that call for an

23   occupation, we have a lot of jurors who are retired, so we're

24   going to have to address that in some of these questions, maybe

25   just in the instruction.  So I'm looking at page 6, we'll

```
 1   figure out how to do that, but that should -- when we get the
 2   juror lists in an ordinary case, often you'll see "retired" and
 3   you end up having to ask them, you know, what did you used to
 4   do?  We'll...
 5          So with respect to the next series of questions about
 6   siblings, I guess I understand why there's some interest in
 7   that.  It seems to be overdoing it a little by asking so many
 8   questions.  Is there a way to condense, like just ask, Please
 9   describe your -- if you have siblings, describe your
10   relationship to them or something like that?
11          MR. WEINREB:  That seems so general that it could
12   elicit non-informative answers.
13          THE COURT:  I guess these seem too stake, S-T-A-K-E.
14   It really kind of goes to what we might expect to be an issue
15   in the case rather pointedly.  I'm not sure I like that.  So I
16   would suggest that we could condense 18, 19 and 20 into a
17   somewhat appropriate question, and if you want to think about
18   it and submit a more general possibility for that --
19          MR. WEINREB:  I think that can be done.
20          THE COURT:  I don't know how useful 22 will be to us.
21   It seems to be --
22          MR. WEINREB:  That's fine.  We proposed that and we'll
23   strike that.
24          MR. BRUCK:  That's absolutely fine with us.
25          THE COURT:  On the next page, the two questions I had
```

1    were about 24 and 27.  What's the interest in psychology or

2    other sociology and stuff?

3         MR. WEINREB:  The defense has proposed a psychological

4    expert so...

5         MR. BRUCK:  No, we haven't.  We've proposed a social

6    worker to narrate --

7         MS. CLARKE:  We have a teaching witness on trauma, if

8    that's what you mean.

9         MR. WEINREB:  I thought Ms. Porterfield is a

10   psychologist.

11        MS. CLARKE:  Yeah, she is.  And the proposal is that

12   she would do some teaching on trauma.  So you're right.

13        THE COURT:  Well, I think if that's the motive for

14   those, I think 24 is enough without 27.

15        MS. CLARKE:  Yeah.

16        THE COURT:  The answers to 27 in one of those boxes is

17   going to be pretty unreliable anyway.  That's like when you go

18   to the doctor and he says, "On 1 to 10 what's the pain level,"

19   you're going to get wildly different numbers and you're not

20   going to be able to correlate that.

21        MS. CLARKE:  Right, 15 and minus 2.

22        MR. WEINREB:  I agree.

23        THE COURT:  I think we wanted to add a couple of other

24   options in 28, like a student or, you know, instead of

25   "homemaking" we may say "stay-at-home parent."

 1          MR. BRUCK:  The year needs to be updated to 2015.

 2          THE COURT:  Yeah.

 3          Thirty, this would call for -- I guess this seems a

 4   little too broad to me anyway.  It called for unpublished works

 5   on something that has nothing to do with the case.  I mean,

 6   somebody may have written on the training of dogs or something

 7   like that, an unpublished manuscript.  I don't think we need to

 8   know that.  What's the interest?

 9          I mean, I agree entirely, for example, with Number 31,

10   which is if you have a web or blog or something like that.

11   That's, you know -- so two problems, I guess, with 30.

12   Published versus unpublished.  I mean, published I get;

13   unpublished I'm not sure of and somehow the relation to the

14   issues in the case or something that might be.

15          MR. WEINREB:  I think one of the concerns for both

16   parties is trying to identify jurors who very badly want to be

17   on the jury in order that they can write about it afterwards.

18   So this is a proxy for getting at that.

19          THE COURT:  I see.  Okay.  That explanation satisfies

20   me.

21          Number 33:  I don't want to know what TV shows they

22   watch.

23          MR. WEINREB:  Actually, your Honor, in that case, we'd

24   ask for some variation on it because one thing the government

25   is particularly concerned about in every case these days is CSI

1    and other police procedural shows that have the police solving

2    every crime through types of forensic --

3            THE COURT:  Well, from your witness list it looks like

4    you're trying to do that.

5            MR. BRUCK:  Yeah.

6            MR. WEINREB:  I mean, some judges go so far now to

7    routinely give a CSI instruction.  No matter what we bring to

8    the table, it's never going to match what they bring on

9    television.

10           THE COURT:  I've given such an instruction in some

11   cases as appropriate, but not every one.  I think we can deal

12   with it otherwise.  I don't think we need that.  I mean, I

13   don't want to know who watches Kim Kardashian, for example.

14           MS. CLARKE:  Although you might be interested.  Who

15   knows.  It might put some other answers in context.

16           (Laughter.)

17           THE COURT:  It might, but I think we'll skip that one.

18           Just, you know, editorial:  35, I would change "ever

19   saw combat" to something like "ever experienced combat" or

20   "participated in combat" or something like that.  That's just

21   the editor in me.

22           Number 39, we've seen a form, and I know it's been

23   used in a couple of the other questionnaires in this court,

24   it's a little more expansive.  Actually, it is more like what

25   we actually would say, I think, in normal jury selection, that

1    you can expect that some of the evidence will come from law

2    enforcement agents, so on and so forth, and it would add a

3    preamble.  It would be the substance but it would be...

4          Forty-one:  My suggestion would be to split it into

5    two, it talks about victims' rights and then reform of any laws

6    as if there's a relationship between those two concepts.  I

7    think we should split it into two questions.

8          Going on to 51, past ten years what court cases have

9    you followed with interest.

10          MR. WEINREB:  That, again, I think is a --

11          THE COURT:  The eager beaver?

12          MR. WEINREB:  The eager beaver, precisely.

13          THE COURT:  Okay.  So if people say "none," you'll be

14    happy with it, basically?

15          MR. WEINREB:  Yes.

16          MS. CLARKE:  Did we have "what was your first reaction

17    when you received your summons"?  We do have that.

18          MR. WEINREB:  Yes.

19          MS. CLARKE:  We had one juror once who answered that

20    question, What did you think when you received your summons in

21    this case, "Larry King here I come."  I don't know what that

22    told us.

23          THE COURT:  I think it told you a lot.

24          MR. MELLIN:  It was a request to excuse.

25          THE COURT:  I can imagine.

1          So 52 and 56 are similar, and I think 56 is the more

2      probative one.  One of the things that I'm concerned about with

3      52 is the list of examples.  They're vastly different kinds of

4      things.  I don't know.  A church, synagogue and mosque is one

5      kind of thing, ACLU and NRA is another kind of thing.  I just

6      thought you might get the same information by 56.  If you

7      added -- instead of "participated in," you know, "contributed

8      to and supported" or something like that and just have

9      them -- that gets to advocacy groups, which I think is the more

10     important aspect, okay?  So we'll strike 52 and maybe beef up

11     56.

12          What's the justification for 55?  For cause, by the

13     way.  I understand what it might be for peremptories, but I'm

14     not sure how you see the connection to the cause excuse.

15          MR. WEINREB:  I don't think there is a connection to a

16     cause excuse.

17          THE COURT:  So I think we should eliminate it.  My

18     objective for the questionnaire is to aid us in screening out

19     people for cause; not just to tell you things that you might

20     rely on in deciding peremptories.

21          MS. CLARKE:  So 52 through 55 go out?

22          THE COURT:  No, no.  Oh, yes, I guess -- no, I guess

23     if 52 goes out, 53 and 54 would be derivative of that.  And for

24     cause purposes I don't see the value of 55.

25          MR. CHAKRAVARTY:  Your Honor, just at the risk of

1    advocating too much for something, I don't think we care what

2    somebody's personal political belief is; I think the

3    inconsistencies that they might demonstrate with other issues

4    like social advocacy groups, that might raise questions in

5    terms of this person as a whole.  And its contextual

6    relationship that at least for me when I saw it, if somebody is

7    a member of the NRA but then they say that they're very

8    liberal, that may be the disconnect that we would want to ask

9    more questions.  Not that there's anything inherently wrong

10   about either of those things, but it's just not typical.

11            THE COURT:  No, I think that's too speculative.  That

12   example, for example, I have no idea whether that is anomalous

13   or not.

14            MR. CHAKRAVARTY:  No, it's probably not.  It's

15   probably not.  And if you're a libertarian or something else --

16   I'm sure it was a bad example.

17            THE COURT:  A minor language issue with 58.  Maybe I

18   would -- I thought of asking it as what religion do you

19   currently practice, so it's something more than just a label.

20   Somebody would say a little more about -- I guess maybe that

21   relates to the next question -- or the next couple of

22   questions, so maybe it's not.

23            But on 62, I thought "experience with" was -- I know

24   you're trying to, you know, uncover useful information and so

25   on.  I just reacted against the "experience with."  It almost

1    amplified some sense of alien like --

2         MR. BRUCK:  "Do you know or have interaction with?"

3         THE COURT:  Yeah.  What we would suggest is "have

4    substantial interaction" or something like that.

5         MS. CLARKE:  That makes sense.  I don't even know if

6    "substantial," but "interaction" will raise the question.

7         THE COURT:  Sixty-three, again, I'd ask slightly

8    differently.  I would like -- again, we want to, I think, focus

9    on what might be troubling.  In some of the other contexts it's

10   been phrased something like:  "Do you have strongly positive or

11   strongly negative views about Muslims or about Islam," and the

12   "strongly" suggesting this isn't just a casual -- like I think

13   they're exotic or something like that.  I mean, you want to

14   know if there's something there.

15        I think I might yield on this one.  I thought 65 was

16   slightly redundant of 64, but I guess I don't care that much.

17   I guess this is a time to raise the government's suggested

18   additional one that was not agreed to, about --

19        MR. WEINREB:  Conspiracy of the government, the

20   government being trying to identify conspiracy theorists who

21   think that -- despite how, you know, you pose a particularly

22   pernicious threat to the voir dire process, because I think

23   that conspiracy theorists tend to hold very tightly to their

24   views and yet are very reluctant to reveal them publicly

25   because they know that it exposes them to ridicule.

1          And this is a case, as I think the defense on motion

2   recently regarding protesters outside the courtroom,

3   acknowledges involves -- has triggered a lot of conspiracy

4   theories out there.  And it's particularly concerning to the

5   government that we try to -- that people like that may try to

6   get onto the jury, conceal their views.  And this would be a --

7          THE COURT:  Well, if they're going to do that, why

8   would they answer the question truthfully?

9          MR. WEINREB:  Well, I think that the question is

10  phrased -- is enough -- departs sufficiently from the facts of

11  the case that they may feel more willing to answer it than a

12  straight-up question, "Do you believe that there was a

13  conspiracy in this particular case?"  It's just a way of trying

14  to flush that out.

15         THE COURT:  Don't you think an affirmative answer to

16  66 would suggest that?

17         MR. WEINREB:  No, because I think that there are many

18  people -- many, many people who believe the War on Terror is

19  overblown or exaggerated without believing that there is a

20  conspiracy among government and private actors to create phony

21  examples of terrorism.  In other words, you can believe that

22  the government is devoting far too many resources to the War on

23  Terror and could be doing -- devoting more to other cases

24  without believing that the government actually creates

25  terrorist events, stages them in order to create support for

 1   it.

 2          THE COURT:  But wouldn't a person who believed the

 3   government conspiracy theory think that the War on Terror is

 4   overblown and exaggerated?  So, again, assuming a truthful

 5   answer -- an untruthful answer is another whole problem, but I

 6   don't know that the question --

 7          MR. CHAKRAVARTY:  If you got a yes answer you could

 8   follow up on it here.  What do you mean by that?

 9          THE COURT:  Yeah, I don't think I'm inclined to follow

10   that.

11          MR. CHAKRAVARTY:  I think one of the concerns was some

12   of the conspiracy theories is that the -- it's not necessarily

13   a terrorism-based conspiracy; it's just a distrust of

14   government or what happened post-Ferguson, a lot of the

15   conspiracy amongst police officers and the law enforcement,

16   particularly in light of the Todashev shooting and the

17   interrelationship between those conspiracy theorists and the

18   Marathon bombing conspiracy theorists, there's a lot on the

19   blogasphere that is divorced from the War on Terror kind of --

20          THE COURT:  Is there any other question about distrust

21   of the government?

22          MR. WEINREB:  I don't believe so.

23          THE COURT:  I think there might have been -- was there

24   one in the Phillipos?  I thought I saw that someplace.  I don't

25   remember it in this draft, actually.

1          MR. MELLIN:  Question 48 on page 13 says "If you have

2     strongly positive or negative views about law enforcement

3     officers, please explain."

4          THE COURT:  That's specific to law enforcement and

5     that's the model I was thinking of for Muslims or Islam,

6     strongly positive or negative.  So prosecutors, defense

7     lawyers, maybe there would be a place to add something about

8     trust of the government, or I don't know how you'd formulate

9     it.  Maybe you can suggest that.  But I think I'd --

10          First, I think I agree with the defense view that,

11     again, assuming a truthful answer, a person who was a

12     conspiracy theorist would think the War on Terror was

13     overblown, it's a specific instance of what might be a broader

14     view of government misbehavior, but it could also be followed

15     up on for the specific question.

16          But I guess I wouldn't object to a more general

17     question about:  Do you generally think the government is

18     trustworthy or not, or do you have strong views about

19     something -- something like that.  We could work out the

20     proposed language.  Maybe you could submit something.  I think

21     that's a fair question to try to get people who think the

22     government's evil.

23          In 67 and 68, I would like to just add the visual

24     signal by underlining the word "legal."  I think there's so

25     much talk of illegal immigration that people may see that

1    phrase and read it as illegal immigration.  So I want to

2    emphasize we're talking about legal immigration:  "Do you have

3    any problem with legal immigration?"

4          Question 70 in the Phillipos -- well, not Phillipos, I

5    guess Tavhayakov case, there was a questions, it said the

6    defendant was born in wherever he was born, Kazakhstan, and is

7    of Russian descent, and then it said, "Do you have any beliefs,

8    attitudes or opinions regarding Kazakhstan, Russia" -- it

9    listed them.  It was basically the same question but expanded a

10   little as to why you're asking me this question.  They're not

11   going to know why you're asking about Dagestan.  So I think we

12   just save the preamble by leaving it in that region.

13         Question 71 and 72:  I don't know anybody who would

14   answer Question 71 "no."  It's in the nature of being a

15   teenager to be influenced by others.  So I'm not sure how

16   helpful that one is.

17         The next one, I wonder whether you need to say

18   "positively or negatively."  I could imagine that going both

19   ways.  But I guess maybe that's a follow-up question?  I don't

20   know.  So can we live with just 72?

21         MS. CLARKE:  This was a government --

22         MR. WEINREB:  Yes.

23         THE COURT:  Okay.  Obviously, these will get

24   renumbered because we're eliminating...

25         Now, I'm on 18 -- 79.  I guess I see this as a

 1    question that will cause trouble because it will be so

 2    unfocused I don't know if -- I mean, I guess it's one that

 3    might get very interesting answers.  Maybe it's a trigger to

 4    follow-up.

 5            MS. CLARKE:  I think it is.  I mean, you know the

 6    point.

 7            THE COURT:  I expect you'll get answers which have

 8    untrue facts.  I mean, something everybody would agree was

 9    untrue.

10            MR. BRUCK:  Or very prejudicial facts which are not

11    going to come into evidence.  People know everything about this

12    case, it's been reported, whether it's true or not, whether

13    it's admissible or not.

14            MS. CLARKE:  You might want to add a few more lines.

15            THE COURT:  You would have to.  I guess that's one of

16    my concerns.  But if you want to live with it -- this is a

17    question that we'll probably be asking every voir dire person.

18            MR. FICK:  I think it helps to flush out at the top

19    whatever anybody said.  No matter how they impressionistically

20    treated it, it's useful to trigger a follow-up.

21            MR. WEINREB:  I suppose it could be amended to say

22    what are the, you know, three or four most memorable things.

23            MR. BRUCK:  That will reduce the value.  Everyone will

24    say the same thing:  Bombs went off at the Marathon.  A police

25    officer was killed.

1          MR. WEINREB:  I guess my concern about it is

2     that -- is the opposite of an overlong answer which is getting

3     a partial answer, you know, that a juror may know ten things

4     about it, and if you only put down two of them, does that give

5     you a fair picture?

6          MR. BRUCK:  Well, that's a probe and it's for

7     follow-up.

8          MR. CHAKRAVARTY:  We could end up following up on

9     every fact asserted.  Then that would be -- I'm not sure how

10     constructive that would be.  This would take forever with every

11     witness.

12          MR. WEINREB:  Yeah.  And if the question is designed

13     to determine whether the jurors have been exposed to pretrial

14     publicity, that might have affected their ability to be fair

15     and impartial, but I do think that the case law of the Supreme

16     Court ruled it is not necessary to ask jurors what the pretrial

17     publicity is to which they have exposed; it's only possible to

18     ask whether they can put it aside and be fair and impartial.

19          And I am concerned that this one question will turn

20     out to be the question that dominates the entirety of voir dire

21     of the individual jurors unnecessarily.

22          THE COURT:  Yeah, I guess that's my concern as well, I

23     guess.  There will be sort of unmanageable data, I guess is my

24     concern about that.  I think that the preconceptions, and so

25     on, we deal with in a series of other kinds of questions -- I

1    think we're better off without this one as a narrative.

2    　　　MR. BRUCK:  We would -- I think our feelings about

3    that would be affected by the extent to which there will be

4    questioning on this exact issue in individual voir dire where

5    jurors can --

6    　　　THE COURT:  I think one of the common questions is

7    going to be to a juror who answers to 83A, that she thinks

8    Dzhokhar Tsarnaev is guilty, and then we're going to have to

9    ask regardless of that idea that you have now, would you be

10   able to hear the evidence and judge it fairly and perhaps

11   change your mind if the evidence warranted that?  We'll do all

12   that with these other questions, I think.

13   　　　MR. BRUCK:  But it's true that there is a 5-to-4

14   Supreme Court decision that says it does not violate due

15   process not to ask for content, *Mimin versus Virginia*.  It's

16   very much the minority view among courts, state and federal, in

17   the country.  And it tends to, in a case like this where

18   you -- where you have really no ideas what the juror may have

19   swirling around in their head, it makes the juror the judge of

20   their own impartiality in the end not to be able to --

21   　　　THE COURT:  To a large extent that's true.

22   　　　MR. BRUCK:  I'm sorry?

23   　　　THE COURT:  To a large extent that's true, the juror

24   is ordinarily --

25   　　　MR. BRUCK:  But the Court can evaluate more

1    realistically when you know what it is the juror and how

2    much --

3         THE COURT:  I think the other questions will help us

4    do that.  I think this is -- I think we can do without 79.  I

5    mean, I think what we touched on is the biggest issue in voir

6    dire, obviously, because there are going to be a lot of people

7    with preconceptions.  As a matter of fact, you may even wonder

8    about people who have a preconception in the other direction,

9    whether they pay attention to anything in the world.  If they

10   say, no, I know he's not -- that's another -- maybe touching on

11   that -- so we're going to get a lot of "yes" answers to 83A.

12        MR. MELLIN:  Your Honor, Question 78 talks about how

13   much have you been exposed to.

14        THE COURT:  Right.  So I think we'll do okay with

15   that.

16        With respect to 83, I think I would like to add to the

17   menu for each of the subparts a third option, which is "not

18   sure" or "undecided" or something like that:  Yes, no,

19   undecided.

20        MS. CLARKE:  Judge, that raises our --

21        THE COURT:  Yeah, your -- I have it someplace here.

22   Anyway...

23        MS. CLARKE:  Excuse my fingerprints on that.

24        THE COURT:  Yeah, this is the question that added the

25   fifth opportunity, whoever committed the crimes.  So I take

1    it -- take from its absence in the joint draft that the

2    government objects to that?

3              MR. WEINREB:  Yeah, we filed an opposition to that.

4              THE COURT:  Okay.  Let me get those.

5              By the way, let me -- because it came up, Cheryl is

6    another stenographer.  She's going to be splitting time with

7    Marcia.  And she just wanted to get familiar with the

8    vocabulary by sitting in.

9              MS. CLARKE:  I think I passed both of those because we

10   had to file a supplement --

11             MR. WEINREB:  It's possible that the government

12   addressed it in the context of the --

13             THE COURT:  The memo on voir dire.

14             MR. WEINREB:  Exactly, our response to the defense

15   memo on voir dire because I know we did discuss the so-called

16   specific *Morgan* questions there.  But that would not

17   necessarily have addressed the whoever question, although we do

18   object to that question.

19             MR. BRUCK:  That's a publicity question.

20             MR. WEINREB:  Right.  It's sort of a combination.

21             (Pause.)

22             THE COURT:  Well, so there are two questions that the

23   defense proposed:  One was the one -- let me just pause again

24   to add an E, which is whoever committed the crimes should

25   receive the death penalty.  The second one is a new question,

1     death penalty is only appropriate -- is the only appropriate

2     punishment for anyone who has, A, murdered a child,

3     deliberately murdered a police officer.  Those are

4     case-specific, you think?

5              MR. WEINREB:  Those are, although --

6              THE COURT:  So is your objection more to the first one

7     than the second one?

8              MR. WEINREB:  Your Honor, our objection is to -- it's

9     to both of them on that the grounds that they're both, in our

10    view, including the first one, classic so-called stakeout

11    questions, which ask the jurors to stake out a position on the

12    death penalty before they have been instructed that there is a

13    process that is designed to guide their discretion.  It's a

14    legal requirement that they follow it, that they will hear

15    evidence, not just of what they've already heard, may have read

16    or seen in the press, but they will hear evidence of both

17    aggravating factors and mitigating factors and that they will

18    be required to weigh those to make a decision.

19              If you ask them, based on everything you've seen or

20    heard, do you believe that anyone who committed the crime

21    deserves the death penalty, that essentially -- anybody who is

22    asked that, who all they knew was that there was this bomb that

23    went off -- bombs went off at the Marathon; people were killed;

24    it may have been a terrorist act -- many people might say yes

25    to that.  And then later on, What if you were told that this

1    mitigating factor and that mitigating factor and this other

2    mitigating factor, then they might say, Then that's another

3    story.  Then maybe not necessary they should receive the death

4    penalty.  But now you've got inconsistent answers.  They've

5    said one thing in response to written questions, and they've

6    said another thing during follow-up.

7          The Supreme Court has held that inconsistent answers

8    are evidence of substantial impairment, that a person is

9    substantially impaired in considering either mitigating factors

10   under *Morgan* or aggravating factors under *Witt*.  We think that

11   it is a big mistake to lard the record with all of these

12   inconsistent answers which are bound to arise once -- if the

13   jurors are first asked the question in this very one-sided

14   manner and then asked it on follow-up in a much more balanced

15   and fulsome manner, because it will raise a question about

16   every strike for cause or failure to strike somebody for cause,

17   whether it was appropriate or not.

18         So we oppose all of these such questions and think

19   that the Court could ask a -- we're not insensible to the

20   defense's desire to know whether the jurors could, in fact,

21   consider mitigating factors, as they're required to do under

22   *Morgan*, given the aggravating factors in this case.  We're

23   simply asking that the question be asked in a balanced way

24   where the Court could, for example, say to the jurors, If you

25   find the defendant guilty of a capital crime, there will then

1    be -- if the jury finds the defendant guilty of a capital

2    crime, there will then be a second phase of the case where you

3    will hear evidence of aggravating factors and mitigating

4    factors.  Aggravating factors are factors the government

5    believes justify a death sentence; and mitigating factors, the

6    defense believes, justifies a life sentence.  And then the

7    specifics could be introduced.

8         So the government will seek to prove to you, among

9    other things, that -- as an aggravating factor, that the

10   defendant murdered a child, murdered more than one person

11   during the course of the crime, murdered a police officer,

12   deliberately committed murder during an act of terrorism.  And

13   the defense will seek to prove mitigating factors, among other

14   things, that the defendant was 19, that he was influenced by

15   his brother to commit the crime, that his dysfunctional family

16   made him vulnerable to that kind of influence.  Would you be

17   able to balance any aggravating factors you found proved with

18   any mitigating factors you found proved in making a

19   death-penalty decision or a sentencing decision?  And that way

20   the specific aggravating factors are presented to the jury in a

21   context where they understand what their obligation is going to

22   be down the road.

23        MR. BRUCK:  Well, first of all, I think we need to

24   separate the two issues.  I think both questions are critical,

25   but they are about different things.  Our proposed No. 83 is

1    really a pretrial publicity question.  It is not disqualifying

2    in and of itself, but it is certainly extremely important to

3    know if, on the basis of what a juror has heard outside the

4    courtroom, the only remaining question in their mind is whether

5    the government charged the right person and, if so, he should

6    get the death penalty.

7          Now, that is a -- nobody could think that an impartial

8    juror could be seated in that frame of mind.  That is clearly a

9    question that goes to a bias.  We are not saying that an

10   affirmative answer to that is the end of the inquiry, but it

11   most certainly flags something that the Court would want to

12   follow up on, which is true of most of the questions on the

13   questionnaire, except this one is about something that's really

14   important.

15         If the task is could a juror be rehabilitated, could a

16   juror still be impartial despite an answer, we might as well

17   not have a questionnaire because almost every question flunks

18   that test.  That's not the test.  This is an important thing to

19   know.

20         There will be jurors who say, Nothing could change my

21   mind.  This case -- this crime deserves the death penalty,

22   period, based on what they've heard, but they're willing to

23   make sure that they've got the right guy.  So that's 83, and it

24   goes to exposure to pretrial publicity much more directly than

25   a lot of other questions that were on the questionnaire.

1          Number 100, our proposed, we don't at all agree that

2     the Court should pretry the case by listing aggravating and

3     mitigating factors and getting the jury to say if they could go

4     either way depending on family or brother or someone.  That is

5     stakeout.  That is a pretrial of the case.

6          We're talking about something very different.  The

7     *Morgan* v. Illinois inquiry is whether or not, where the

8     government charges a crime, the juror would always vote for the

9     death penalty upon conviction of that crime.  And we are

10    referring to the actual charges that have been brought by the

11    government.  That is the basic *Morgan* inquiry.

12         Now, the juror will have -- will -- it will be

13    explained to the juror about aggravation and mitigation before

14    there's a ruling.  Mr. Weinreb says, Well, it would be a

15    mistake to put things on the record that would create a

16    problem.  As their briefing makes clear, the appellate --

17    standard of appellate review on these rulings is extremely

18    differential.  If there's conflicting evidence, 99 times out of

19    100 the appellate court defers to the way that the trial judge

20    resolved the issue.

21         I think what the government is really afraid of is

22    finding out what jurors actually think because there are a lot

23    of jurors who have a categorical view, which is, if you kill a

24    child, you get the death penalty.  They are not relativistic

25    about it.  They have fixed core moral values that -- they don't

1  vary.  And there's nothing wrong with that.  But it is a

2  disqualifying bias under *Morgan* v. Illinois because we have a

3  discretionary sentencing system in this country, and it's

4  required by the Eighth Amendment.  And a lot of people reject

5  that.  And the point of this process is to find out whether

6  such a person is the juror before you.

7         So these are critically important questions.  They

8  flag an area for follow-up.  The fact that someone, again, says

9  this doesn't mean the inquiry is over.  It means there has to

10  be the inquiry.  If we don't know that a juror holds this view,

11  we're going to miss inquiring and really testing, and we

12  weren't really being able to evaluate critically whether this

13  juror is in the eye-for-an-eye category.  With respect to the

14  charges in this case, which is the only really legal question,

15  it doesn't matter if a person could vote for life in some other

16  kind of capital crime that is not charged in this case.  That

17  doesn't make them a competent juror.

18         So that's why these are not stakeout questions.  They

19  are questions that go to this basic question of impartiality.

20  And we think, at this preliminary stage, this is valuable

21  information.  We've cited the very, very troubling findings of

22  the National Capital Jury Project, which show that huge

23  percentages of jurors go through the entire process, sentence

24  people to death, and then tell an interviewer later that they

25  thought it was mandated by the law.  It wasn't really

1    discretionary.  We need to get at that to make sure we identify

2    jurors who take that view.  So that's why we think that there's

3    nothing at all wrong with this question, and it ought to be on

4    the questionnaire.

5         MR. WEINREB:  Your Honor, if I could just respond

6    briefly.  So the record is clarified, there already is, in

7    Question 83 in the questionnaire, this proposed 83, just

8    Subsection (e) that would add something.  We -- frankly, when

9    we were talking to the defense about this -- none of these

10   Questions (a) through (d) are legally required to be asked, and

11   there's case law holding that they not be asked.  We thought it

12   was a reasonable compromise to allow (a) through (d) to be

13   asked but that (e) took the inquiry a step too far.  I just

14   want to make that point.

15        And, secondly, I also want to reemphasize the point

16   that the government is not proposing that the jurors not be

17   asked whether the fact that a child -- the government will seek

18   to prove as an aggravating factor.  It's not an element of the

19   crime that a child be murdered.  It's not an element of any of

20   these crimes.  It's not an element that a police officer be

21   murdered or any of those things.  These are aggravating

22   factors.  They're -- and what we're not -- we're not proposing

23   that jurors not be asked whether, in the face of those, they

24   would be unable to weigh aggravating factors or mitigating

25   factors.

1          We're only objecting to the manner in which the

2     question is asked.  In our view, it's simply that it should be

3     asked in a manner that lets the jurors know that there will be

4     evidence of mitigating factors -- that these are aggravating

5     factors.  There will be evidence of mitigating factors and that

6     they will be required to weigh the aggravators and the

7     mitigators.  And the question that should be asked is whether

8     they would be capable of doing that.  That is what *Morgan* held,

9     is that the jurors have to be able to give consideration to

10    mitigating factors in order to be fair and impartial.

11         THE COURT:  Okay.  Well, I think, for these two

12    questions, I want to go back to the case law a little bit

13    before I resolve that.  So we'll let you know about that.  I

14    understand the arguments.

15         With respect to 84, the only concern I have is it

16    doesn't distinguish -- this is about expressed opinions.  It

17    doesn't distinguish between casual or trivial expressions and

18    more deeply-held ones.  And so the contrast, for example, the

19    difference between somebody who mentions something relatively

20    briefly or casually to a family member or something like that,

21    that they may be watching TV with, as opposed to somebody who's

22    a loud mouth broadcasting their views to the world.  I mean,

23    the second one we really want to know about.  I'm not sure we'd

24    need to know about the first one.

25         You know, in a case where people -- large numbers of

 1    people will know about the case, they are likely to have said

 2    something to somebody about the case.  I'm not sure we need to

 3    know all of that.  But the person who feels so strongly that he

 4    grabs people by the lapels and tells them is a different story.

 5    I don't know if there's a way to target that.

 6          And we do -- in next questions -- or the next

 7    question, I guess, have a particular indicator of strongly-held

 8    views, that you went public with them in some way, maybe that

 9    word worked into 84 maybe.  I don't know.  I'm just commenting

10    off the top of my head now, whether we can distinguish between

11    public and private conversations or outside the context of your

12    family.  Even people in the workplace are likely to have said

13    something to each other.  We're going to be trolling for too

14    much information.

15          MS. CLARKE:  Would you want to say, in 84, If yes, how

16    often have you expressed that opinion?

17          THE COURT:  I guess that's one thing.  I mean, you

18    could -- you could ask something like, Under what

19    circumstances, or something like that.

20          MS. CLARKE:  I think that's what we were trying to get

21    at.  If yes, please explain, but --

22          THE COURT:  Yeah.  We could ask them to explain.

23          MS. CLARKE:  Please explain how often and under what

24    circumstances.

25          THE COURT:  Yeah.  We could do something like that.

1          MR. WEINREB:  This was a defense proposed question.

2     We don't have any stake in it, so whatever --

3          THE COURT:  That might be enough to narrow it down.

4          MR. BRUCK:  Right.  And it's a question for follow-up.

5          MR. WEINREB:  The only thing we'd ask, your Honor,

6     which I think we overlooked the first time around, it should

7     say, If you answered yes or no to any of the above because --

8          THE COURT:  Yeah.  I think that's right.

9          MS. CLARKE:  If you answered yes or no -- if you

10    answered the above questions --

11         THE COURT:  If we --

12         MS. CLARKE:  Maybe it's just, Have you expressed --

13         MR. CHAKRAVARTY:  No, because the Court is going to

14    add in --

15         THE COURT:  There will be a third option because I'm

16    sure --

17         MS. CLARKE:  You're right.

18         THE COURT:  We're going to need more lines.

19         MR. CHAKRAVARTY:  If we're saying, Please explain,

20    without distinguishing qualitatively whether it's one of these

21    trivial expressions or not, then we are technically asking them

22    to explain even the trivial, offhanded comments.  Should we

23    make a qualitative qualifier, Please explain any substantial

24    conversations?

25         THE COURT:  You could -- perhaps you could add, Have

1    you expressed or stated your opinion at length to anybody else?

2        MR. BRUCK:  Not many people would say yes to that.

3        THE COURT:  I'm just trying to think of measures that

4    could make it a more prominent thing.  "At length" is one or

5    "repeatedly" or "on multiple occasions" or something like that,

6    which would also suggest intensity of thought.

7        MR. FICK:  That just seems naturally the kind of

8    amorphous thing you'd get in follow-up rather than the

9    question.  At different cutoff points, you would be just sort

10   of eliminating people from an answer or excluding an answer.

11   People's self-described scale of substances is higher or lower.

12   There's no way to gauge that.

13       MR. BRUCK:  Maybe one solution -- we haven't discussed

14   it, obviously -- is just to take out the "please explain" and

15   have it be a follow-up.  Just get the juror to tell us about it

16   when we talk to them.  That will quickly solve the problem

17   there.

18       MR. WEINREB:  My personal feeling is that jurors are

19   not going to -- this question is going to be hard for them to

20   answer.  They're not going to remember whether they've stated

21   -- most people.  There may be some who have felt strongly about

22   it and broadcast their opinion far and wide.  But did any of

23   them mention it to their spouse or to a friend?  They may have

24   trouble even recalling and --

25       MR. BRUCK:  We just felt that, "Have you expressed or

1 formed an opinion," is one of the classic inquiries on voir

2 dire.  It's -- and this is expressed.  There's great insight to

3 that.

4    THE COURT:  As it relates back, it is a very specific

5 opinion.  It's an (a), (b), (c), or (d), right?

6    MR. BRUCK:  Right.

7    THE COURT:  And possibly (e).  Maybe that should be

8 more evident.  In other words, it's not just, Have you talked

9 about this case or the facts, you know, with your wife or

10 people at the workplace.  It's, Have you expressed the opinion

11 you've checked specifically?

12    MR. BRUCK:  Sure.

13    THE COURT:  Maybe we can rework it to make sure that's

14 what was expressed.

15    MS. CLARKE:  That makes sense.

16    THE COURT:  People undoubtedly talked about the case.

17 If somebody has never said, I think he's guilty, 83(a), then

18 they haven't expressed that -- they haven't expressed that

19 opinion.

20    MS. CLARKE:  That's what the question is getting at

21 because it's referring back to --

22    THE COURT:  Right.  So maybe we have to --

23    MR. MELLIN:  Your Honor, may I make a suggestion?

24 That we take out (a) through (d), and then at the end of the

25 83(a), where it says, "Have you formed an opinion," we continue

1    on and say "...about the defendant's guilt or the appropriate

2    punishment in this case?"  And then let the jurors answer that.

3    And we can then say, Please explain.  Then let the jurors then

4    explain what their answer is without us directing them

5    necessarily to (a) through (d).  And I think that accomplishes

6    what the defense is looking for, is people that have an opinion

7    and what that opinion is.

8              MR. WEINREB:  I would second that because I think

9    there are a lot of people who may feel, for whom the answer may

10   be, Well, if everything that I may have heard about it is true,

11   then he's guilty.  But people don't make those kinds of fine

12   distinctions when they're being asked questions.

13             THE COURT:  Particularly non-lawyers.

14             MR. WEINREB:  In a questionnaire kind of way.  I think

15   this question, again, is another one that's going to create

16   more trouble than help because these are questions obviously of

17   -- that -- where both parties are interested in the answers,

18   but the manner in which they're asked can both lock a juror

19   into something that they don't really believe and seem to

20   create inconsistent answers.  So I think a more open-ended one

21   actually would be a better one and that this also may be

22   something it would be best to hear face to face rather than

23   have them try to write it out.

24             THE COURT:  As an alternative to that, in the preamble

25   to 83, suppose that at the end you said, Have you formed a firm

1    opinion as opposed to a casual impression?  And then you could

2    ask -- then maybe ask the four questions.

3            MR. FICK:  Again, I think we would lose a lot of

4    valuable information because you never know how any particular

5    juror is going to gauge their level of firmness, which is what

6    the question is calling for.  What we want is the opinion

7    generally for follow-up without having to sort of have no

8    control group or denominator against which to gauge the level

9    of firmness the juror is assuming in their answer.

10           MR. BRUCK:  That's right.

11           MR. WEINREB:  I think -- the Supreme Court's cases on

12   this, I think, have taken a very practical approach to this

13   issue.  They've said repeatedly, in a case that's made the

14   news, Every intelligent person is going to have formed some

15   kind of opinion one way or another.  It's not really -- I think

16   that simply asking, Have you formed an opinion and what is the

17   opinion, doesn't get at what this question is designed to get

18   at, which is, precisely how firm is the opinion.  How open are

19   you to actually hearing evidence?  Can you distinguish between

20   what you hear outside of the courtroom and what you hear inside

21   of the courtroom?  So that all of these checkboxes and these

22   follow-up questions on the questionnaire are not going to --

23   it's going to be more noise than signal.

24           MR. BRUCK:  I don't think we should lose sight of the

25   fact that this is a questionnaire.  This is not the voir dire.

1    This is trying to screen broadly in a very efficient way to

2    know what to flag.  And giving people an exit ramp from

3    declaring the most basic answer seems like a mistake.

4         THE COURT:  Okay.  Well I understand the position.  I

5    want to think a little more about it.  We'll leave that to

6    resolve as well.

7         MR. BRUCK:  I hate to work backward but there's one

8    last point.  As far as "undecided," if there is going to be a

9    question, Have you formed an opinion, yes or no, and then to

10   give an "undecided," well, "undecided" means you haven't formed

11   an opinion, so it seems internally inconsistent to have an

12   "undecided" box.  Jurors should find that confusing.  If

13   there's another way to do it, fine, but not in the format we

14   have now.

15        THE COURT:  I think, strictly speaking, you're right.

16   But I think the jurors would not be that strict about it.  And

17   if they -- we're not -- I think that gets to my firmness issue.

18   If they had not firmly decided it, then they would signal that

19   by saying "not sure," maybe.  How about "maybe"?  I don't think

20   so.  Okay.  We'll deal with those.

21        I think 91 is just a reformulation of the language a

22   little bit.

23        We were thinking of suggesting for 93, again, to get

24   the strength of belief, to ask whether -- something like, Do

25   you have a strong opinion about the appropriateness of the

1  death penalty in general, or something like that, pro or con,

2  or something.  What are your views on the death penalty, is a

3  little squishy, I guess.  If somebody is more or less

4  ambivalent, they could tell us that, if somebody has a strong

5  view.  But, you know, I think we get better answers in the next

6  two questions, which, I think, are the real good questions

7  about the death penalty.  I think they're very nuanced.

8  Certainly, No. 95 is.  I think it gives a broader range.

9          MS. CLARKE:  Judge, one thing 93 does is it starts the

10  juror thinking about it.

11          THE COURT:  Right.  I guess I don't so much object to

12  a tee-up question, but I think it should be a little bit more

13  about strong views as opposed to --

14          MS. CLARKE:  Many instances you'll find people that

15  have never really thought about it.

16          THE COURT:  I think that's probably right.

17          MS. CLARKE:  To say, Do you have a strong view about

18  it?, of course not.  I haven't thought about it.  So if you

19  prompt them by saying, What are your views about it?, it

20  prompts me to start thinking about it.  I haven't thought about

21  it.  We'll get answers like that, I strongly favor; I strongly

22  don't favor.  You sort of let them off the hook with the strong

23  views.  That's one of the purposes of the voir dire in a

24  capital case, is to sort of surface that.  So I would urge you

25  to leave it vague because you're right.  The next couple of

1    questions do sort of focus it more.

2         MR. MELLIN:  Your Honor, I think it's fine.  It is --

3    I agree with the Court that 94 and 95 really get to the meat of

4    the matter, but 93 is typically one of the questions we have in

5    these questionnaires.  It does get them to thinking.

6         The reality is, your Honor, even after filling out

7    this questionnaire, they'll come back during the individual

8    voir dire and say they've thought about it a little bit over

9    time.  And some of the answers they gave in voir dire they

10   would disagree with now having had some time to think about it.

11   I think it's fine in there if the defense wants to have it in

12   there.  I don't think it really elicits the information that

13   ultimately we're both going to be relying on.

14        THE COURT:  Could you preface it with a conditional?

15   If you have views about the death penalty in general, would you

16   tell us what they are?

17        MR. MELLIN:  That's fine.

18        MR. WEINREB:  That's fair.

19        THE COURT:  Okay.  So I guess I'm wondering how many

20   of these questions we ask.  I have some concern about all the

21   rest, 96 through 100, as listed here.  What does a change of

22   view tell us?  It obviously could be in either direction.

23        MR. BRUCK:  Right.  It gives -- I think it gets to the

24   strength with which people hold a view, if it's really based on

25   something they've heard or --

1          MS. CLARKE:  Experienced.

2          MR. BRUCK:  Experienced, yeah.  It could very well get

3    to something which --

4          THE COURT:  I'll buy that.

5          The next two sound like final exam questions for

6    Criminal Justice 101.  I don't -- I think they're unnecessary

7    in light of the previous questions.

8          I'd like to rephrase 99 if you want to have it.  I

9    think you might ask something like, If your views about the

10   death penalty have been formed on the basis of your religion,

11   spiritual training, and so on, please explain, something like

12   that.  The way it's phrased is, What does your religion teach,

13   for example, people are going to have wild answers about what

14   their religion teaches, many of them wrong probably.

15         MR. WEINREB:  If your views are religiously based -- I

16   guess it's not just religion.  Based on religion, philosophy or

17   spiritual training, we agree with that.

18         THE COURT:  The No. 100 here, it's -- it seems to be

19   suggesting that any case, no matter how similar or dissimilar

20   to this, can be rated.  In other words, I don't -- a person

21   might think the death penalty is imposed too often, generally,

22   but be indifferent as to a view on this particular case.  I'm

23   not -- I guess maybe it's not going to be useful information.

24   I'm not sure how harmful it is to ask.  I just don't think it's

25   going to tell us very much.  This is in general again, and

1    that's a lot of territory.

2          MR. BRUCK:  Well, too seldom there's a way of reading

3    the comments to what people -- articles about this case in the

4    paper, you realize there are people out there who, Kill them

5    all and let God sort it out, is their justice philosophy.

6          MR. WEINREB:  We don't have strong feelings on it.

7          THE COURT:  Okay.  102, I think I agree with the

8    substance.  I don't know.  We're thinking about fiddling with

9    the language.  If nobody has a real problem with it -- it asks

10   two questions.  We were thinking of letting them -- phrasing it

11   more generally.  "As a result of any possible verdict you might

12   have," you're kind of opening the universe.  What we're getting

13   at is, are You going to feel pressured to come to a particular

14   conclusion by what people will think?

15         MS. CLARKE:  Can you go back to your hairdresser and

16   your dentist and your doctor and say, Yeah, I voted for --

17         THE COURT:  As the question reflects, for either

18   direction.  I guess the question is:  Do you ask it more

19   generally, or do you put the two directions in there?  I guess

20   I'm not -- if everybody is content with that, we'll leave this.

21         MR. WEINREB:  We're content.

22         MR. MELLIN:  That's fine.

23         THE COURT:  103 and 104, I think the preamble should

24   rather be, If you found Mr. Tsarnaev guilty and you decided the

25   death penalty was appropriate..., it kind of presumes guilt.

1          MR. WEINREB:  Yes, that's a better question.

2          MS. CLARKE:  Good thing somebody is reading this.

3          THE COURT:  105, we might just fiddle with the

4     language.

5          Then there were a bunch of questions that weren't

6     covered that we have seen in some of the other forms.  I just

7     want to mention some of them, see what your reaction is.  Some

8     of the other forms have asked specifically whether the juror

9     will be able to follow the law as given by the judge.  I don't

10    know.  That's kind of a -- I know they've done it.  It's kind

11    of a wishy-washy answer.  Everyone is going to say yes,

12    probably.  I don't know if we need that.

13         I would typically, in a general voir dire and a

14    40-person venire, ask if the jury had any difficulty with

15    faithfully applying the burden of proof, presumption of

16    innocence, and proof beyond a reasonable doubt.  Some of the

17    other questionnaires have had a question about that.

18         MR. WEINREB:  The government's view is that asking the

19    jurors whether they could follow particular instructions to the

20    exclusion of others is not fair or appropriate because the case

21    law emphasizes the importance of taking the instructions as a

22    whole, following them all as opposed to particular ones.

23         THE COURT:  Yeah.  But, as I said, that is one I

24    generally would ask the group in the courtroom, if anybody has

25    any reservation.  I hardly ever get an affirmative answer.

1           MR. WEINREB:  We certainly don't oppose that.

2           THE COURT:  It's kind of a didactic question, too,

3     just tell them this is what will be expected of them.

4           MR. BRUCK:  In this case, we are signaling the jurors

5     to give the expected answers, a civics lesson.  This case is so

6     different in terms of what people have been exposed to, the

7     emotional turmoil surrounding the case.  It just seems like we

8     ought to get the jurors unprompted and not signal to them what

9     they think.

10          THE COURT:  Usually, it's the defense that asks for

11    that question, but you don't want it?

12          MR. BRUCK:  Uh-umm.

13          THE COURT:  There are other similar ones, but I gather

14    from what you've said, you don't think -- some of the others

15    have asked, Will you abide by my instructions not to read the

16    newspapers and look on the TV and --

17          MR. MELLIN:  Your Honor, maybe I'm misunderstanding.

18    Is the Court not going to give those general instructions to

19    the jury?

20          THE COURT:  They will be told this.  This is whether

21    we'll ask them whether they will have any difficulty following

22    it.  Maybe the better course is to tell them and look sternly

23    at them and say, I expect you to do that.

24          MR. WEINREB:  The government would be in favor of

25    reminding the jurors in as many ways as possible once they're

1    sworn.

2            THE COURT:  We'll do that constantly during the case.

3            The other question I've had is a specific question

4    about -- or an opportunity to note which of the prior questions

5    they might like to add something in private about.  I don't

6    remember whether the preliminary instructions do that.

7            MS. CLARKE:  I think we indicated --

8            THE COURT:  The ones that --

9            MR. WEINREB:  I think in the very beginning.

10           THE COURT:  The ones that we would replace, it will do

11   that.  It will say, you know, Answer -- If you don't want to

12   answer the question at all because it's sensitive, just

13   indicate that.  And then at the end, there are two ways of

14   doing it.  You write "private" or something in response to the

15   question, and that will be a signal, or there's a catchall

16   question like this at the end:  Are there any questions as to

17   which you have something confidential to say that you don't

18   want to write on the paper?, or something like that.

19           MS. CLARKE:  Sure.

20           MR. WEINREB:  That's fine.

21           THE COURT:  Finally, I don't know whether this -- we

22   didn't see this in any of the others, but it's a possible

23   question.  Because we may be dealing with people who have

24   tentative views, to assess perhaps their susceptibility or

25   receptivity to moving off those views, I was thinking of a

1    question something like, Have you ever changed your mind about

2    an important decision in your life?  If so, could you give an

3    example?  And then ask, What was it that led you to change your

4    mind?  Additional information?  Reconsideration of the pros and

5    cons?  Opinions of others?  Other?  I don't know.  I've never

6    seen it.  I sort of made it up.  But it tests something we're

7    interested in, and that is rigidity.

8            MR. MELLIN:  That's fine.

9            MR. CHAKRAVARTY:  We did that in the Munyenyezi case,

10    which was from New Hampshire.  It was a mistrial and a hung

11    jury because of rigid views.  So in the second questionnaire,

12    we particularly said that on that.  So we got to a verdict.

13    There's no artful way of saying that that's going to capture

14    everything, but it's just to start the discussion.  It will

15    prompt very probing follow-up questions about which they may

16    feel sensitive about.

17            MR. WEINREB:  The government is in favor of that.  I

18    think that's a very useful question.

19            MR. BRUCK:  The question would stop there.  It

20    wouldn't go on to ask more about whether that process could --

21    the juror would --

22            THE COURT:  No, the question wouldn't.  But, again, I

23    expect we're going to have that discussion in the individual

24    voir dire with just about everybody, you know, Will you be able

25    to decide this on the facts that you have yet to hear in the

1    course of the case rather than on pretrial notions or whatever

2    or tendencies?  All right.  We'll stick it in someplace.  I'm

3    not sure exactly where it goes.

4              MS. CLARKE:  P.S.

5              THE COURT:  Right.

6              MR. BRUCK:  Maybe a stupid question.  But what are

7    jurors going to have to write on as far as -- are they going to

8    have clipboards?

9              THE COURT:  They get a steno pad.  There's one in the

10   corner like that, with a pen on it.

11             MR. WEINREB:  Did you mean in the jury box or filling

12   these out?

13             THE COURT:  I'm sorry, filling these out.  That's for

14   the jury box.  I'm sorry.

15             MR. BRUCK:  They will be sitting in chairs?

16             THE COURT:  No.  They'll be sitting in armed chairs,

17   like a classroom.

18             MR. WEINREB:  They're pretty thick.

19             MS. CLARKE:  Will they have a table?

20             THE COURT:  Downstairs in the jury assembly room.

21             MR. BRUCK:  They have chairs?

22             THE COURT:  They have clipboards then.  They'll have

23   clipboards.  I think I remember Jim telling me that.  Yes, I'm

24   pretty sure.  If they don't have any, we'll go out and get

25   some.

1          MR. FICK:  In the jury assembly room, where will the

2     parties and the defendant be seated?

3          THE COURT:  So the room is reoriented.  If you think

4     of it, as you walk in the glass doors, they'll move, I guess,

5     the podium against the far right wall towards the back towards

6     where you can go back into the offices of the jury room.  And

7     there will be tables set up there for counsel on both sides and

8     the defendant and me for the preliminary instructions,

9     introducing people.  One of the advantages of that is that

10    there's a way to get the defendant into the --

11         MS. CLARKE:  In and out.

12         THE COURT:  -- in the back, and he's seated right

13    there, and the marshals can be more or less out of sight.

14         MS. CLARKE:  And not shackled.

15         THE COURT:  And most of the chairs will be facing

16    straight onto that for the room.  I think, because of the

17    quirkiness of the dimensions of the room, there's actually a

18    wing that faces the other way.  But, basically, they will be in

19    the back by where you would come if you came through the jury

20    clerk's office.  And it takes -- 200 people fill that room.

21         We will allow the press to be -- and I guess the

22    public -- to be in the area outside the glass wall so they can

23    observe but they won't -- nobody will be in the room.

24         MS. CLARKE:  What about contact with the jurors as

25    they leave?  Is the press going to be instructed or they won't

1    be instructed?

2         THE COURT:  The jurors are going to be instructed, for

3    sure, that they're not to talk to anybody.  I don't remember

4    whether the decorum order does that.  Is that filed yet?  No.

5    We've been working on so many drafts.  As a matter of fact, I

6    haven't shown Jane.  This is one of our drafts.

7         MR. WATKINS:  We have a lot like that, too.

8         THE COURT:  I like it a lot.

9         MR. WEINREB:  We appreciate that.

10        MS. CLARKE:  We would like it to say "motion granted."

11        THE COURT:  Anyway, our decorum order addresses that

12   and tells them there will be no contact with the jurors,

13   including anybody, of course, who has a list.

14        MS. CLARKE:  I don't think we're your problem.

15        MR. WEINREB:  For what it's worth -- I don't know if

16   the Court is aware of it, but it's been our experience at the

17   U.S. Attorney's Office that the local press and even the

18   national press tend to be very good at respecting decorum

19   orders.  They're old hands and they understand what the rules

20   are.  The foreign press very often doesn't understand the rules

21   and seems to find it impossible to fathom them so -- just as a

22   -- for what it's worth.

23        THE COURT:  That's good to know.  I don't think we're

24   going to have that much foreign press as a regular matter.  It

25   will be in and out.  I'm trying to think from memory.  We only

1   put three of them in the room.  There are a bunch of others.

2   There may be a dozen foreign -- total foreign media people that

3   have signed up for credentials.  I don't know.  Do you know,

4   Paul?  Do you know the answer to that?

5           THE CLERK:  I don't.  It's not more than that, Judge.

6           THE COURT:  It's a much smaller number than for the

7   domestic.

8           MS. CLARKE:  When do they see the "call to serve"

9   video, the jurors, assuming you show it?

10          THE COURT:  They -- so jurors arrive at 8, I think,

11  roughly.  Is that right, Paul?

12          THE CLERK:  It's about 8 to 8:15.  Then they all

13  congregate, and then they show the video.  And then Jim gives

14  them some preliminaries.  Once they see the video, then they

15  can go out and take a break for a few minutes and then come

16  back.  Yes, it's first thing in the morning before they go out

17  anywhere.

18          THE COURT:  So roughly 8:30, in that range, I think

19  they see it.  I'm not sure they're going to go out for a break

20  this time.  Once they come in, they're going to be there, I

21  think.  Okay.

22          I think that may be it for now.  We have a couple of

23  -- oh, yeah.  There was a reference earlier to the defense -- I

24  think you made a reference to -- defense motion about

25  supporters outside the courthouse.  I don't know if you're

 1    going to respond to that.

 2              MR. WEINREB:  We weren't planning to.

 3              THE COURT:  I don't think there's anything I can do.

 4    I can't provide specifically for a location for people because

 5    of their point of view.

 6              MR. BRUCK:  Yeah.

 7              THE COURT:  There is going to be -- the marshals have

 8    worked out plans for making sure there's ingress and egress

 9    from the courthouse without disturbance.  So there will be --

10    people who are demonstrators will be in one place, and the

11    press will be behind.  I think I saw it cordoned the last time.

12    It will be approximately those dimensions.  I think people who

13    are doing the planning are cognizant of the *MaCullen* case,

14    35-foot buffer zone, that 35 is too much.  We don't have much

15    of a space there anyway.  There's nothing we can do really, I'm

16    thinking.  We'll watch it.  We'll watch it.  But I can't say

17    people who have a particular point of view can't stand where

18    others with a different point of view can stand.

19              MR. BRUCK:  The point of the motion was not for a

20    contact-specific description but just to have -- courthouses

21    are not about demonstrations.  They're about fair trials.  If

22    there are going to be demonstrators, there's plenty of

23    constitutional warrant for putting them a good distance away

24    from people coming into the courthouse.

25              THE COURT:  As you know, the available distances are

1   shrinking drastically, and we'll probably be affected by winter

2   conditions as well.  Our objective, and I think is consonant

3   with yours, but I can't make any specific orders, I don't

4   think.  We'll watch it.  If it seems to be a problem, we'll see

5   what we can do to adapt but --

6        I know that the marshals either know or presume, keep

7   a close eye on bulletin boards and things like that that may be

8   advertising.  So they know if someone is planning to show up

9   with 35 people.  Generally speaking, they get advisories of

10  that sort of thing.  They get a head's up sometimes.

11       MR. BRUCK:  One last suggestion, if I may, about the

12  preamble to the questionnaire.  We didn't include it in our

13  version, but it seems like it's going to be a long

14  questionnaire.  Some people are going to run out of gas.  The

15  most important questions tend to be at the end.  Something that

16  says that the more detailed your response is, the faster or

17  shorter the jury selection process will be, something that

18  encourages not only, as we do, to be honest and full and so on

19  but that to give them a reason why they should really try to --

20       THE COURT:  I think the draft we're going to use says

21  something close to that.  We'll look at it with that in mind.

22  It does emphasize the importance of the questionnaire as a

23  means of speeding things up, making the process more efficient.

24       So there were a couple of questions you were going to

25  confer about, I think?

1          MS. CLARKE:  My notes show we were going to look at

2    condensing 18 through 20 and figuring out something about the

3    strongly negative views about the government to add into the 48

4    series, somewhere in there.  We were to give you --

5          THE COURT:  Can we have that by midmorning tomorrow or

6    something?  Is that realistic?

7          MS. CLARKE:  Sure.

8          MR. WEINREB:  Yeah.

9          THE COURT:  Say 11:00 tomorrow?

10         MS. CLARKE:  I assume we can merge our witness lists

11   into one.

12         MR. WEINREB:  I'm sure we can do that.

13         MS. CLARKE:  You want that by Friday?  What's today?

14         THE COURT:  Today is --

15         MS. CLARKE:  Tuesday.

16         THE COURT:  I'll take your word for it.

17         MS. CLARKE:  I'm glad to hear that.

18         THE COURT:  One last thing.  Jane reminds me, there

19   was a motion just filed about identifying foreign witnesses.

20         MS. CLARKE:  Foreign.

21         THE COURT:  Obviously, there hasn't been any time for

22   response.  We came here to preview that.

23         MR. WEINREB:  Yeah.  We intend to oppose that.

24         THE COURT:  How will that affect the list?  I guess it

25   would mean we -- unless it could be resolved by Friday so we

 1    could prepare a list for attachment on Monday, we'd have to

 2    leave them off in case I agree with the defense.  I think it's

 3    highly unlikely that the venire would be familiar with somebody

 4    who lived in --

 5         MS. CLARKE:  Dagestan, Chechnya.

 6         THE COURT:  I was going to try to say the city name

 7    but I can't.  Makhachkala.

 8         MS. CLARKE:  Makhachkala.

 9         THE COURT:  There's probably no harm in leaving them

10    off for the time being, or you could get the opposition in in

11    enough time so I could decide it by then whether to include

12    them.

13         MR. WEINREB:  Right.  So -- today is Tuesday.  We

14    could get it by -- the trial briefs are now due?

15         THE COURT:  Tomorrow.

16         MR. MELLIN:  Your Honor, can we -- are these witnesses

17    just penalty-phase witnesses so there would not be any overseas

18    guilt phase?

19         MS. CLARKE:  Correct.

20         MR. WEINREB:  There's still a question of the jurors.

21         Can you give us a sense of how many people we're

22    talking about?

23         MR. FICK:  A dozen, less than 20, something like that.

24         MR. WEINREB:  I think they should be -- we'll file

25    something by the end of Thursday.

```
 1              THE COURT:  The witness list was supposed to be
 2    yesterday.
 3              MS. CLARKE:  We disclosed it.
 4              THE COURT:  Can I see it?
 5              MS. CLARKE:  No.
 6    (Laughter.)
 7              THE COURT:  And these people weren't on it, or were on
 8    it?
 9              MS. CLARKE:  Were not.
10              THE COURT:  You don't want them to know, is the point
11    of the motion?
12              MS. CLARKE:  That's the point of the motion.  The
13    other option would be for us to provide the Court with those
14    names to attach or to provide the jurors without the government
15    seeing it.  I just don't think that anybody is going to
16    recognize any of these folks.
17              MR. MELLIN:  Your Honor, could I have one moment to
18    talk to --
19              THE COURT:  Yeah.
20    (Discussion held off the record.)
21              MR. WEINREB:  So our opposition would be based
22    primarily on the view that we're entitled to know who the
23    witnesses are who are coming, less on the concern that any of
24    the people on the venire will know any of the witnesses since
25    they are from remote parts of the world.  So -- and if they are
```

1    all penalty-phase witnesses, then it's not urgent that the

2    matter be decided before Monday -- before Friday.

3          THE COURT:  So they could be omitted from the list

4    that goes to the jury.

5          MR. WEINREB:  They could be omitted, although I think

6    it would be worthwhile perhaps talking about what will happen

7    if someone takes the witness stand and a juror says --

8          MR. MELLIN:  Actually, your Honor, I think it may be

9    wise to add them to the witness list and we do not see the list

10   that is produced to the jurors that they look at.  Is that fair

11   for you?  So that if you add them to the list that the jurors

12   are looking at, then we're all covered if this issue were to

13   come up later.  The names are on that list.  Jurors have a

14   chance to see them.  We just do not see that list.

15         MR. BRUCK:  Well --

16         MS. CLARKE:  That's one of the things we suggested.

17         MR. FICK:  We may need to ask, Do you know anyone who

18   lives in Pakistan, Chechnya?

19         THE COURT:  Didn't we ask that?

20         MR. FICK:  There's a question of whether you know

21   anybody of those ethnic backgrounds.  I guess, when you think

22   about it, some of these people may live in a place and not be

23   of the same ethic background.  It might be safer to make it

24   geographic for this purpose.

25         THE COURT:  Question 69, "If you know anyone who, to

1    the best of your knowledge, is Chechen, Avar, Dagestani or

2    Chechen, Avar or Dagestani descent...," you could maybe massage

3    that.

4             MR. BRUCK:  Or who lives in?

5             MR. WEINREB:  I propose a different solution.  If

6    defense is willing to bear the risk that a juror will know one

7    of these witnesses, then that witness will be barred from

8    testifying.  If the defense is confident enough that the jurors

9    aren't going to know any of them, then that doesn't seem like

10   a --

11            MS. CLARKE:  I don't think we should ever agree to a

12   barring of a penalty-phase witness.

13            MR. MELLIN:  I think you're covered by the question

14   though.  69 says, "Please describe who it is you know and how

15   you know them."  So if they do know someone who's Dagestani,

16   they can say, This is the person I know.

17            MR. WEINREB:  If they know the person is Dagestani.

18            THE COURT:  Are those all the categories you want to

19   ask about?

20            MR. FICK:  Probably.

21            THE COURT:  Avar is an ethic group rather than a

22   geographically defined group, right?

23            MS. CLARKE:  Right.

24            MR. FICK:  Where Chechen is both ethnic and

25   geographic.

1          THE COURT:  Right.

2          MR. WEINREB:  I would seriously doubt any of the

3     jurors, even if they know any of the witnesses, would know

4     they're Avar or Chechen.  I don't know that that's going to be

5     a sufficient screening.

6          THE COURT:  We could add something about it.  Do you

7     know anybody who lives in the following countries?

8          MR. WEINREB:  Again, I think the more pertinent

9     question is, if somebody takes the witness stand and one of the

10     jurors raises their hands and says, I know that person, I went

11     to college with that person, I had no idea they were Avar or

12     Chechen, what's the solution going to be?  I'm just looking for

13     the practical answer.

14          MR. WATKINS:  We have six alternates if that, indeed,

15     happens.

16          THE COURT:  That's a possible answer.

17          MR. WEINREB:  That's a possibility.

18          THE COURT:  It is possible for -- particularly, we

19     know it because there are people we can think of in this cast

20     of characters who have come here to study and who have gone

21     back, or maybe they're not present characters, but there are

22     people who could be in that category.  The world is a lot more

23     mobile than it used to be.  Mr. Todashev is an example of that.

24          MS. CLARKE:  Do you want to go --

25          THE COURT:  It is possible that they could have come

 1    in contact with somebody here.

 2              MS. CLARKE:  Do you want to go with Steve's suggestion

 3    and we create the entirety of the list?

 4              MR. WEINREB:  I don't -- I think it's a -- it is a

 5    measure.  I don't think it's a sufficient measure because I

 6    don't think that many people could tell you with respect to --

 7              THE COURT:  No, no.  He's talking about the

 8    confidential list.

 9              MR. WEINREB:  The confidential list, that, of course,

10    would be sufficient.

11              THE COURT:  Why don't we do that.  I think it will

12    require some special handling in the jury, but I think we can

13    probably do that.  If we can't, then we'll have to think of

14    something else.

15              So that then, I guess, relieves any time frame to

16    brief that issue about ultimate disclosure to the government

17    when and whatever.

18              Okay.  All right.  I think it's lunchtime.  Thank you.

19    (Whereupon, at 1:04 p.m. the hearing concluded.)

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4    Dahlstrom, RMR, CRR, Official Reporters of the United States

 5    District Court, do hereby certify that the foregoing transcript

 6    constitutes, to the best of our skill and ability, a true and

 7    accurate transcription of our stenotype notes taken in the

 8    matter of Criminal Action No. 13-10200-GAO, United States of

 9    America v. Dzhokhar A. Tsarnaev.

10

11    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13

14    /s/ Cheryl Dahlstrom
      CHERYL DAHLSTROM, RMR, CRR
15    Official Court Reporter

16

17    Date:  January 26, 2015

18

19

20

21

22

23

24

25
```